These appeals arise from a case involving a commercial dispute between Benetton S.p.A. (an Italian clothing manufacturer), and some Alabama store owners.
Benetton, Benetton Manufacturing Corporation (Benetton's United States manufacturing facility), Benetton Services Corporation (Benetton's United States subsidiary) (collectively referred to hereinafter as "Benetton"), and DixieBen Company (Benetton's independent sales representative), Mr. Gilberto Casagrande (the primary salesman for DixieBen and its sole shareholder), and Boaz-Ben Company (a discount store for Benetton merchandise owned and operated by Casagrande) appeal from seven separate judgments.
In 1984, Casagrande met with Frank and Karle Falkenburg to discuss the possibility of opening a Benetton retail store in Brookwood Mall in Birmingham, Alabama. According to the Falkenburgs, they decided to open the store based on Casagrande's statements concerning the profitability of Benetton stores. The Falkenburgs formed a corporation called Al-Ben, Inc., to operate this store.
Al-Ben opened several other Benetton stores in Alabama. All of the stores opened late because of delays caused by Italian workers required by Benetton to install Italian fixtures in the stores and because of the late arrival of merchandise. Al-Ben also had problems with nonconforming and unordered merchandise being delivered to the stores and with Benetton's refusing to allow Al-Ben to return it. Al-Ben also contends that it had a right of first refusal for any future Benetton stores and that Benetton subsequently violated that right.
In 1986, Clardy Malugen and her brother, Joe Malugen, met with Casagrande concerning opening a store in Dothan. The Malugens, along with Harrison Parrish and Mary Lois Parrish, formed Benedot, Inc., to operate stores in Dothan and Auburn. The stores were delayed in opening because the Italian workers were late in installing certain fixtures and because both stores received nonconforming and unordered merchandise, which Benedot was forced to sell at a loss because Benetton would not accept a return of the merchandise.
According to Al-Ben and Benedot, Casagrande told the operators of those companies that they would earn substantial profits; that Benetton would provide Al-Ben and Benedot with guidance and instructions about how to successfully run their stores; and that if the stores were not successful, Benetton would buy the stores at a profit.
Al-Ben and Benedot sued Benetton, DixieBen, Casagrande, and Boaz-Ben, alleging fraud, conspiracy, and breach of contract. Benetton, DixieBen, Casagrande, and Boaz-Ben counterclaimed against Al-Ben and Benedot and against the Falkenburgs individually, for money owed on unpaid invoices.
Al-Ben and Benedot claimed that Benetton, DixieBen, Casagrande, and Boaz-Ben expanded into the southeastern United States by sending its agent, Casagrande, into the area to find buyers for Benetton retail outlets. According to Al-Ben and Benedot, Benetton persuaded them, through lies, threats, and blackmail, to open Benetton *Page 397 
stores in an already weak market area. To prove their claims, Al-Ben and Benedot presented, among other things, memorandums from Casagrande to Benetton's corporate office in Italy. (It should be noted that the following excerpts were translated, as stipulated by the parties, from Italian into English; they are quoted here in their original translation.) On April 11, 1984, Casagrande wrote:
 "[T]he three states Louisiana, Mississippi, Alabama they really are deep south. Anyway, we think that we can do an honest job with at least 20 shops. (Obviously shops with total amount of sales are rarely over $500,000.) The amount is what it is but we'll try to squeeze it as much as possible, but around Christmas often they go around here with shorts. (It is not too cold, except for few days).
 "Generally, they don't care too much the way they dress in the daytime. In the evening they are instead very conservative in the way they dress in the evening. Black dress to go out to dinner. What is missing is the high middle income. They are according to me the one that spend the most in the shops. There are very few families very very rich and lot of families real poor. Anyway, they don't go around naked. In any case, they buy something. . . . But even us poor little negroes down here will do our part even with the limitation of our possibilities looking to the future."
R.T. 96-100.
On March 11, 1987, Casagrande wrote:
 "I would like to call your attention to a few facts.
 "1. This zone [Louisiana, Mississippi and Alabama] is the smallest, is the poorest, is the most difficult of all the United States.
 "2. With the unemployment rate of 25%, the sensibility to style is below zero and the family income is the lowest in America, I believe. There is little to dream — please come here to see and you will realize with your own eyes.
 "3. With inhuman efforts we have opened about 20 adults, 9 number 12's [children's] and we are opening 3 Sisley [brand name of clothing produced by Benetton]. Furthermore, in the Autumn we will start a test for a fourth one.
 "4. I believe that other zones richer and more evolved would not have given these results.
 "5. Here is like to work in Basilicata or Calabero (dictator says you'll have to know that these two are two of the poorest regions in Italy). Lots of negroes, a lot of poverty and hunger. But these things you do not read in the papers in Italy. You need to come here to see them. It is 30° centigrade nine months of the year with 85% humidity.
". . . .
 "6. . . . [W]ith this zone you too must have a little patience. I have a lot. Last winter without having any client still convinced to do it. (It is useless for us to hide behind a shadow of one finger. The Sisley [store] will lose money for still another two years and then they can only be done by rich clients. But in this area are not here yet.). . . ."
". . . ."
R.T. 100-05.
On April 9, 1987, Casagrande wrote:
 "7. Al-Ben. Clients with four shops. Excellent under the profile of merchandising. Is that one that probably understand better than all our product in the area. She[1] follows the shops well, she's organized with the computer, etc. Even in the payments, she's doing well until a year ago. When, in her own town, Birmingham, Alabama, we opened another shop with another client. That strangely is that lady of CloverBen [the Benetton shop located in the Galleria shopping mall near Birmingham] that she should give her some competition and instead, when everything goes wrong, then everything goes wrong, and *Page 398 
she has to close the shop.[2] When we opened with the new client, CloverBen, the old client Al-Ben was very upset and obviously, now that she knows that the other shop is for sale, she is doing everything to buy it for herself. She is giving us a lot of problems. I do not want to give Al-Ben the shop of the CloverBen for sale for our well-known reasons, all the healthy business strategy, to create competition. At this point, the sale of the shop of the CloverBen seems finally closed, I blocked the merchandise in custom for Al-Ben. I didn't do it before because if I was not able to find somebody else I would have to give the shop to Al-Ben and I advised her if she doesn't pay right away, she will have delays also for winter merchandise deliveries. . . . If I would have had a strong CloverBen instead of having a situation of a shop for sale and would have a strong client and aggressive, at this time I could have done a little different with Al-Ben. Like, not allow her to do Sisley [store]. But, as we well know, she will lose money for at least another couple of years and then, a deal arrived even to have had patience until she finished the assembly of the furniture. Or, if I would have thought that the CloverBen could have done the Sisley, I could have blocked the spring merchandise since the beginning to the Al-Ben, etc. But, with the CloverBen so weak, . . . 'I was caught with my tail under the door until now.' Only now that CloverBen has a dependable buyer, and then Al-Ben is already ahead with construction work of Sisley, I could intervene to block the merchandise to Al-Ben and threaten her with the winter merchandise. Then, at this point, the games with Al-Ben, since she already created all these problems with the payments, I'll fix her up in this way. Overall, move with caution. Do not blackmail her too much with the winter '87 for now, because she could also decide to quit everything and then the situation become even more complicated. Having as soon as possible all the last winter paid, so the risk is half. Then, once the winter '86 is paid, that obviously must happen before the new shipment for winter '87, tie her wrist and keep the merchandise blocked for autumn/winter '87 until she brings me a letter of credit. . . . This area [the South] is too small, too weak, too short of resources and then vulnerable and at very high risk . . . and is not any good to have the knife by the handle and to know how to use it,. . . . If there is no meat to cut. . . ."
R.T. 100-05.
After a jury trial, the court entered the following judgments:
 1) Judgment in favor of Al-Ben, Inc., and against Benetton S.p.A., Benetton Services Corporation, Benetton Manufacturing Corporation, Gilberto Casagrande, DixieBen Company, and Boaz-Ben Company, in the amount of $1,500,000 in punitive damages.
 2) Judgment in favor of Benedot, Inc., and against Benetton S.p.A., Benetton Services Corporation, Benetton Manufacturing Corporation, Gilberto Casagrande, DixieBen Company, and Boaz-Ben Company in the amount of $1,000,000 in punitive damages.
 3) Judgment in favor of Benetton S.p.A. and Benetton Manufacturing Corporation, as to their counterclaim in seeking to pierce the corporate veil as to Al-Ben and against Frank and Karle Falkenburg, with damages assessed in the amount of $160,000.
 4) Judgment in favor of Benetton S.p.A., Benetton Services Corporation, and Benetton Manufacturing Corporation and against Benedot, Inc., on the counterclaim based on accounts past due, with damages assessed in the amount of $211,458. 19.
 5) Judgment in favor of Benetton S.p.A., Benetton Services Corporation, and Benetton Manufacturing Corporation and against Al-Ben, Inc. as to the counterclaim on accounts past due, with damages assessed in the amount of $1,041,092.18.
 6) Judgment in favor of Benetton S.p.A. and Benetton Manufacturing Corporation and against Karle Falkenburg. No damages were assessed. *Page 399 
 7) Judgment in favor of Benetton S.p.A. and Benetton Manufacturing Corporation and against Frank Falkenburg. No damages were assessed.
Although there was some confusion concerning Benetton's notice of appeal, all the parties on appeal agreed that the $160,000 judgment in favor of Benetton S.p.A. and Benetton Manufacturing Corporation on their counterclaim seeking to pierce the corporate veil and impose personal liability against Frank and Karle Falkenburg is a valid and unappealed judgment. The parties also agreed that each of the judgments appealed from is a final and appealable judgment. The Falkenburgs contend that Benetton's notice of appeal was untimely, but we find all the appeals to be timely. Additionally, we are treating the Falkenburgs as non-parties to the appeals, as all the parties agreed.
The first issue to be discussed is whether the doctrine of res judicata or the doctrine of collateral estoppel bars Al-Ben's claims against Benetton.
On December 19, 1988, DixieBen sued the Falkenburgs in a federal court in Louisiana; that action was based on alleged personal guarantees by the Falkenburgs to pay Al-Ben's debt. The case was transferred to the United States District Court for the Northern District of Alabama, and it is this federal litigation that Benetton argues bars Al-Ben's present claims against Benetton. On October 15, 1993, a final judgment in the federal action was entered against the Falkenburgs based on their personal guarantees on Al-Ben's debt.
The elements of the doctrine of res judicata are: 1) a prior judgment on the merits; 2) that the prior judgment was rendered by a court of competent jurisdiction; 3) that the prior judgment was entered in a case involving substantially the same parties as those in the later case; and 4) that the same cause of action is involved in both actions. Thomas v. Lynn,620 So.2d 615 (Ala. 1993). If one element is missing, then the doctrine of res judicata will not bar the second action.
To determine whether the same cause of action is involved in both actions, the court must decide whether the issues in the two actions are the same and whether the same evidence would support a recovery for the plaintiffs in both actions. That is, did the issues involved in the earlier action comprehend all that is involved in the issues in the later action. SelmaFoundry Supply Co. v. Peoples Bank Trust Co., 598 So.2d 844
(Ala. 1992). In Selma Foundry, this Court made it clear that the "same evidence" test applies in determining whether the same cause of action is presented in consecutive actions with regard to the fourth element of res judicata.
Selma Foundry involved a bankruptcy proceeding wherein Selma Foundry asked the bankruptcy court to order its creditor, Peoples Bank, to return repossessed machinery to the foundry. The bankruptcy court denied the motion to require the bank to turn over the property. Subsequently, Selma Foundry sued Peoples Bank, alleging fraud, interference with business relations, conversion, trespass, and commercially unreasonable disposition of collateral. The trial court dismissed Selma Foundry's action, based on the doctrine of res judicata and judicial estoppel. As to the res judicata issue, this Court held that the bankruptcy court's ruling on the turnover request did not require a decision on the merits of Selma Foundry's claims presented in its later action against Peoples Bank. Additionally, the Court held that a hearing on turnover proceedings in a bankruptcy court is not the proper forum for litigating tort claims.
In Vaughan v. Barr, 600 So.2d 994 (Ala. 1992), the Court held that the doctrine of res judicata did not bar an action to establish an easement by necessity where the same parties had previously litigated a boundary line dispute involving the same piece of land. "The issue involved here [in the action to establish an easement by necessity] might have been litigated in the boundary line case, but that fact alone does not bar its litigation in a subsequent lawsuit." Vaughan, 600 So.2d at 995. An action to establish an easement by necessity and an action to determine a boundary line are based on different theories, *Page 400 
involve different areas of law, require different evidence, and carry different elements that must be proven. Vaughan.
Croft v. Pate, 585 So.2d 799 (Ala. 1991), illustrates this Court's application of the same-evidence test to determine a res judicata question. In Croft, the evidence applicable to one party's right to redeem a piece of property once another party had purchased it at a foreclosure sale was not the same as the evidence necessary to establish a claim of intentional interference with business relations. Therefore, the Court held that the doctrine of res judicata did not bar the second action, based on intentional interference with business relations, after the trial court had entered a summary judgment in the earlier action to redeem.
The Court's reasoning in Pierce v. Rummell, 535 So.2d 594
(Ala. 1988), applies to this case. In Pierce, the plaintiff pleaded in the first action all the facts that served as the basis for her fraud and conspiracy claims in the second action. The court hearing the first action was ruling on whether the defendant was in compliance with a divorce judgment, not on the fraud and conspiracy claims. The doctrine of res judicata did not bar the second action, because the same cause of action was not involved in both actions.
The federal district court necessarily found that DixieBen, the independent sales representative for Benetton, had an agreement with Benetton to reimburse Benetton for debt owed by Al-Ben to Benetton for Benetton merchandise. The Falkenburgs had personally guaranteed Al-Ben's debt, but they revoked their personal guarantees on February 17, 1988. The court found that the evidence established that Benetton had unpaid invoices for goods shipped to Al-Ben. Subsequently, the court determined that the Falkenburgs were liable for the portion of Al-Ben's debt that they had personally guaranteed before February 17, 1988.
We cannot say that the same cause of action is present in both actions. The Falkenburgs' liability, through personal guarantees, for Al-Ben's debt based on unpaid invoices does not involve the issues of fraud, conspiracy, and breach of contract. The first action does not involve the issues raised in the second action, and the same evidence would not support a recovery for the plaintiffs in both actions. Therefore, the doctrine of res judicata does not bar Al-Ben's action against Benetton based on fraud, conspiracy, and breach of contract.
We now address whether the doctrine of collateral estoppel bars Al-Ben from now litigating any of the issues presented in the prior case involving the Falkenburgs' liability for Al-Ben's debts to DixieBen. In order for the doctrine of collateral estoppel to apply, the following elements must be met: 1) the second action must involve an issue identical to the one litigated in the earlier action; 2) the issue must have been actually litigated in the earlier action; 3) the resolution of the issue must have been necessary to the judgment in the earlier action; and 4) the same parties must be involved in the two actions. Dairyland Ins. Co. v. Jackson,566 So.2d 723 (Ala. 1990).
Benetton argues that Al-Ben is barred from litigating any issue concerning nonconforming and unordered merchandise, because it claims that that issue was decided in the earlier action in the federal court. However, it is clear from the federal court's order in DixieBen's action against the Falkenburgs that the court made no finding as to the Falkenburgs' allegations regarding non-conforming and unordered merchandise. The federal court stated: "The defendant[s] have alleged shipments of unordered or non-conforming goods. . . . While the plaintiffs do not concede that the defendants are entitled to any set-off amounts, they have moved the court to enter final judgment in the amount of the difference between the total of the unpaid invoices and the total set-off claimed by the defendants." It is clear that the issue regarding the nonconforming and unordered goods was not actually litigated in the federal action; therefore, Al-Ben was not barred from presenting that issue in this case.
Benetton argues that Benedot is barred by the doctrines of res judicata and collateral estoppel from presenting its fraud claims. An earlier action involving Benedot had concerned a preliminary injunction based *Page 401 
on a letter of credit. In an appeal in that earlier action, this Court stated the pertinent facts regarding the injunction:
 "Benedot was formed for the purpose of selling Benetton clothing at retail. The agreement between Benedot and Benetton provided that Benedot would sell only Benetton clothing. Benedot opened a retail outlet in Dothan and one in Auburn.
 "Benedot placed several orders with Benetton over a period of approximately 36 months. All of the orders were delivered late, and all contained some non-conforming merchandise. Benedot's account with Benetton became past due in the amount of approximately $140,000, although the exact past due amount was disputed by Benedot.
 "Benedot was told by Benetton that Benetton had made changes in personnel, and that future orders would be conforming and would be delivered on time. Benedot placed a 'spring/summer 1988' order with Benetton.
 "As a condition to shipping Benedot's order, Benetton required Benedot to pay $20,000, and to have issued to Benetton an irrevocable letter of credit in the amount of $61,000. Pursuant to Benedot's request, Southland [Bank] issued an irrevocable letter of credit to Benetton. . . ."
Benetton Services Corp. v. Benedot, Inc., 551 So.2d 295, 297
(Ala. 1989).
The spring/summer 1988 order was delivered late and contained nonconforming goods. 551 So.2d at 298. Benedot accepted the shipment. Benedot's account regarding the spring/summer 1988 order became past due, and Benetton drew against the letter of credit. Southland Bank refused to pay Benetton, advising it that a temporary restraining order had been issued enjoining Southland Bank from making payment thereunder. After a hearing, the trial court granted a preliminary injunction enjoining Benetton from drawing upon, and Southland from honoring, the letter of credit. 551 So.2d at 298.
Payment of an irrevocable letter of credit may be enjoined if there is evidence of forgery or fraud in the issuance of the letter or fraud in the underlying transaction for which the letter of credit was issued. This Court held that Benedot had failed to prove that Benetton, when it stated that it would ship conforming goods in a timely manner, had an intent to deceive Benedot. 551 So.2d at 299. The Court noted that Benedot had an adequate remedy at law, i.e., it could sue Benetton for breach of contract, and it decided that the injunction should be reversed. 551 So.2d at 299.
The prior action involved a temporary restraining order (T.R.O.) followed by a preliminary injunction. A proceeding based on an application for a temporary restraining order "is not an 'action' in the ordinary sense" of that word; a T.R.O., by its very nature, is temporary and "[a] proceeding on an application for a T.R.O. . . . does not reach the merits of a case." Ferguson v. Commercial Bank, 578 So.2d 1234, 1236
(Ala. 1991). In Ferguson, we held that a dismissal of an application for a T.R.O. as moot, was not a judgment on the merits and therefore did not bar a subsequent action under the doctrine of res judicata. Like an application for a T.R.O., an application for preliminary injunction does not commence an "action" in the ordinary sense of that word. The purpose of a preliminary injunction is to prevent irreparable injury and thereby to preserve the court's ability to render a meaningful decision on the merits. United States v. Alabama, 791 F.2d 1450
(11th Cir. 1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1287,94 L.Ed.2d 144 (1987).
Clearly, Benedot's proceeding seeking a preliminary injunction against Benetton based on the letter of credit does not bar this action. The preliminary injunction was not a judgment on the merits; therefore, all the elements of res judicata were not met.
The doctrine of collateral estoppel, contrary to Benetton's argument, does not bar Benedot from litigating the issue of fraud in this case. In the appeal from the preliminary injunction, this Court held that Benedot had failed to show that it would suffer irreparable injury absent the granting of the injunction. Therefore, the issues in the present case are not identical to the issues underlying the preliminary injunction, and the issues *Page 402 
resolved in the preliminary injunction proceeding were not decided on the merits.
We now turn to the issue of jury charges. Benetton requested a jury charge on promissory fraud. The trial court refused Benetton's proposed written charge, and in charging the jury the court did not give a charge on promissory fraud. Benetton objected to the court's failure to give the written charge, but it did not object to the court's failure to orally charge on promissory fraud, which now it argues was error.
Rule 51, Ala.R.Civ.P., states in pertinent part:
 "No party may assign as error the giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection."
(Emphasis added.)
On its face, Rule 51 requires a party to object to the failure to give a requested charge and requires the party to object to oral charges that are erroneous, misleading, incomplete, or otherwise improper. Because Benetton objected only to the trial court's refusal to give its requested written charge on promissory fraud, any alleged error concerning the trial court's failure to orally charge on promissory fraud is waived.
At this point, we note that Benetton cites Orchelle v. CSXTransportation, Inc., 574 So.2d 749 (Ala. 1990), for the proposition that an objection to a refusal to give a proposed written instruction preserves for review the trial court's failure to give an oral charge on the area of law covered by the proposed written instruction. However, Orchelle is distinguishable from this case. In Orchelle, the parties had extensive discussion with the trial court, at the charging conference, concerning the applicability of the law underlying the proposed jury charge. The colloquy between the trial court and the parties put the court on notice of its alleged error even though the defendant failed to object to any of the charges that were actually given to the jury.
In this case, the court refused certain written charges at the charging conference. After charging the jury on the applicable law, the court asked for objections to those charges. At that time, Benetton did object to certain other charges that were given, but it did not object to the trial court's failure to charge on promissory fraud; it thereby waived that issue. Nevertheless, Benetton did preserve the issue of whether the trial court erred in refusing to give its specific written charge on promissory fraud.
The charge requested by Benetton stated:
 "[W]hen an alleged misrepresentation relates to a promise to perform some act, a plaintiff must also prove that at the time the promise was made, the defendant had an actual intent not to perform. Accordingly, in this case, Al-Ben and Benedot must prove that Mr. Casagrande had an actual intent that Benetton would not ship Al-Ben and Benedot the merchandise they ordered on a timely basis or would not assist Al-Ben and Benedot in operating their stores in the 'Benetton way.' It is not sufficient for Al-Ben and Benedot to show that Benetton failed to ship them the merchandise they ordered or to provide the promised assistance. They must also prove that when Mr. Casagrande made the alleged promise, he intended to deceive them about his and Benetton's actual intent. If Al-Ben and Benedot fail to prove that Benetton and Mr. Casagrande had such deceitful intent, then you must find for the defendants."
C.R. 2113.
Benetton's proposed charge implies that the only actionable fraud in this case was promissory fraud. That is, by the terms of this proposed written charge, if the jury did not find a present intent to deceive with regard to Casagrande and Benetton's statements, then the jury had to render a verdict in favor of Benetton and Casagrande. Because there was ample evidence in the record of fraud other than promissory fraud, we hold that the trial court properly refused Benetton's written charge on promissory fraud. Cf., Greentree Acceptance, Inc. v.Doan, 529 So.2d 201 (Ala. 1988). As stated *Page 403 
earlier, Benetton waived any argument as to the trial court's failure to charge on promissory fraud.
Benetton argues that the trial court erred in refusing to add prejudgment interest to its money judgments against Al-Ben and Benedot based on the unpaid invoices.
In Healthcare Authority v. Madison County, 601 So.2d 459
(Ala. 1992), we held that the amount due on open accounts was not "certain" until the trial court entered its final judgment. Citing § 8-8-8, Ala. Code 1975, this Court noted that in contract cases the amount owed, if it is certain or can be made certain, may be increased by adding legal interest from the date of the breach until recovery. Additionally, we stated that " '[a] liquidated demands for a sum certain, fixed by agreement or otherwise, bear interest from the time the party becomes liable to pay them.' " 601 So.2d at 463, quoting Miller Co.v. McCown, 531 So.2d 888, 889 (Ala. 1988), quoting C. Gamble,Alabama Law of Damages, § 8-7 (2d ed. 1988)).
Unliquidated damages are those damages that "are not yet reduced to a certainty in respect of amount, nothing more being established than the plaintiff's right to recover; or such [damages] as cannot be fixed by a mere mathematical calculation from ascertained data in the case." Black's Law Dictionary, 393 (6th ed. 1990); see Alfa Mutual Ins. Co. v. Beard,597 So.2d 664, 667 (Ala. 1992).
The facts establish that the amount due to Benetton was uncertain. Benedot and Al-Ben make claims concerning unordered and nonconforming goods with regard to the unpaid invoices. Also, there was a dispute as to the actual terms and conditions of the sales, because the purchase orders did not include terms and conditions when the plaintiffs began to receive merchandise. There was also evidence that Casagrande signed the plaintiffs' names to purchase orders that contained terms and conditions and that merchandise was sent to Al-Ben and Benedot without purchase orders. After reviewing the record, we conclude that the amount due was not certain and, therefore, that prejudgment interest is not due.
The last issue is whether the trial court erred in granting Benedot's motion for relief from judgment under Rule 60(b)(5), Ala.R.Civ.P. On November 20, 1992, the trial court entered a final judgment against Benedot in the amount of $211,458. 19, based on Benetton's counterclaim. On December 17, 1992, Benedot moved, pursuant to Rule 59(e), to reduce the judgment against it by $61,516.48, based on the shipment of the fall/winter 1988 merchandise. On February 5, 1993, Benedot moved under Rule 60(b)(5) to reduce the judgment against it by $133,149.42 on the grounds that the judgment had been partially satisfied to the extent of $71,632.94 (this amount reflects the $61,000 letter of credit plus accrued interest), based on the spring/summer 1988 merchandise, and that Benetton's claim in the amount of $61,516.48, based on the fall/winter 1988 merchandise, had been withdrawn by Benetton, reducing the judgment by a total of $133,149.42. Benedot's Rule 59 motion was denied by operation of law on March 17, 1993, pursuant to Rule 59.1. On April 5, 1993, the trial court entered an order partially granting Benedot's Rule 60(b) motion. On May 5, 1993, the trial court reduced Benetton's judgment against Benedot by the amount of $71,632.94 to reflect partial satisfaction of the judgment, and it further reduced the judgment by $61,516.48 to reflect the amount of Benetton's claim as released, withdrawn, or discharged.
Benetton does not dispute that the trial court correctly reduced the verdict by $71,632.94 on the basis that the judgment had been partially satisfied by this amount. Benetton does dispute whether the judgment should be reduced by $61,516.48. Benetton argues that the trial court abused its discretion in granting the Rule 60(b) motion, arguing that Benetton had not released the $61,516.48 claim against Benedot and that Rule 60(b) is not the appropriate vehicle for challenging that claim. Benetton argues that if Benedot believed that the evidence required a lesser verdict, its recourse was to move for a directed verdict and, subsequently, for a JNOV.
Rule 60(b)(5) provides that a court may relieve a party from a final judgment when "the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application." *Page 404 
In its Rule 60(b)(5) order the trial court stated:
 "Moreover, at the trial of this case, through testimony and evidence presented by Benetton, Benetton released, withdrew and discharged the debt originally claimed against Benedot in the amount of $61,516.48. Therefore, pursuant to the evidence presented at trial, the November 20, 1992 judgment in favor of Benetton and against Benedot is to be further reduced by the amount of $61,516.48, which reflects the amount of the claim released, withdrawn and discharged by Benetton."
C.R. supp. 9-10.
The evidence the trial court was referring to was a statement by Giancarlo Briguglio, Benetton's legal counsel. On direct examination by Benetton, Briguglio stated that because of mistakes in filling the fall/winter 1988 merchandise order, Benetton would not seek any amount due on that shipment. R.T. 1995.
Regardless of whether the trial court should have granted the Rule 59(e) motion or the Rule 60(b)(5) motion, any error is harmless, because it is clear from the record that Benetton was not making any claims for the fall/winter 1988 merchandise. Therefore the judgment against Benedot should be reduced in the amount of $61,516.48. Again, Benetton does not contest the trial court's reduction of the judgment in the amount of $71,632.94 (representing the $61,000 letter of credit and accrued interest).[3] Thus, the trial court correctly reduced the $211,458. 19 judgment by both of the amounts stated above, making the judgment in favor of Benetton against Benedot $78,308.77.
Based on the foregoing, the judgments on appeal are hereby affirmed as follows:
 1) Judgment in favor of Al-Ben, Inc., and against Benetton S.p.A., Benetton Services Corporation, Benetton Manufacturing Corporation, Gilberto Casagrande, DixieBen Company, and Boaz-Ben Company in the amount of $1,500,000 in punitive damages.
 2) Judgment in favor of Benedot, Inc., and against Benetton S.p.A., Benetton Services Corporation, Benetton Manufacturing Corporation, Gilberto Casagrande, DixieBen Company, and Boaz-Ben Company in the amount of $1,000,000 in punitive damages.
 3) Judgment in favor of Benetton S.p.A., Benetton Services Corporation, and Benetton Manufacturing Corporation and against Benedot, Inc., based on the counterclaim relating to accounts past due, with damages assessed in the amount of $78,308.77.
 4) Judgment in favor of Benetton S.p.A., Benetton Services Corporation, and Benetton Manufacturing Corporation and against Al-Ben, Inc., based on the counterclaim relating to accounts past due with damages assessed in the amount of $1,041,092.18.
1920907 — AFFIRMED.
1920958 — AFFIRMED.
1921169 — AFFIRMED.
1921285 — AFFIRMED.
HORNSBY, C.J., and ALMON, HOUSTON, KENNEDY and COOK, JJ., concur.
[1] In another portion of the memorandum, Casagrande refers to Karle Falkenburg as "the whore of Al-Ben."
[2] An earlier passage in the memorandum stated that the owner of CloverBen was selling her store in the Galleria because of personal problems.
[3] Although, neither the doctrine of res judicata nor the doctrine of collateral estoppel barred the claims or issues made by Benetton against Benedot, no party is entitled to a double recovery. Therefore, the trial court correctly reduced the judgment by $71,632.94.