STUART, Chief Justice.
*903 Aliant Bank, a division of USAmeribank ("Aliant"), sued various individuals and business entities involved in a failed effort to develop the Twelve Oaks subdivision in Odenville, alleging that, as a result of those defendants' conspiracy and wrongful actions, Aliant's security interest in the property upon which the Twelve Oaks subdivision was to be built had been rendered worthless. The St. Clair Circuit Court ultimately entered a number of orders either dismissing Aliant's claims or entering a summary judgment in favor of the various defendants. Aliant has filed three appeals; we affirm in part and reverse in part in appeals no. 1150822 and no. 1150823 and affirm in appeal no. 1150824.
I.
On August 15, 2007, Aliant closed a $2.3 million loan ("the Aliant loan") with Four Star Investments, Inc., a corporation that owned 197 acres of land in Odenville that Four Star Investments' president, Bobby R. Smith, Jr. ("Smith"), planned to develop into a subdivision to be known as Twelve Oaks. The proceeds of the Aliant loan were used both to pay off a previous loan on the Twelve Oaks property and to finance construction of the infrastructure for the subdivision. The Aliant loan was secured by a first-priority mortgage on the Twelve Oaks property and was also personally guaranteed by Smith, a contractor who had experience developing several other subdivisions in the St. Clair County area. Another company owned and operated by Smith, Twelve Oaks Properties, Inc., thereafter operated as the entity developing Twelve Oaks.
During this same time frame, Smith was also seeking additional financing from other sources for the development of Twelve Oaks. He eventually came into contact with Pfil Hunt, a Mobile-based investment banker with experience setting up public-private partnerships between municipalities and developers. Hunt advised Smith that one option was to create, pursuant to the Alabama Improvement District Act, § 11-99A-1 et seq., Ala. Code 1975, a type of public corporation known as an "improvement district" for which bonds could be issued and sold, thus providing immediate revenue for the construction of improvements benefiting the Twelve Oaks property. Those bonds would later be repaid by the end purchasers of the developed lots, who would be responsible for paying an annual assessment that ran with the property until the bonds were repaid. Smith ultimately elected to pursue that route, and throughout the fall of 2007 he worked with Hunt and Hunt's management company Wrathell, Hunt & Associates, LLC ("WHA"), to complete the planning of Twelve Oaks and to prepare a petition requesting that the Odenville town council formally create an improvement district that encompassed the Twelve Oaks property. As part of that process, Hunt directed Smith to Tim Harbison, an engineer with the engineering firm Engineers *904 of the South, LLC ("EOS"), who, in November 2007, created an engineer's report detailing the feasibility of the planned Twelve Oaks subdivision. That report, based on figures provided by Smith, stated that it would cost $5,618,000 to complete the Twelve Oaks infrastructure, including roads, sidewalks, signage, street lighting, landscaping and irrigation, earthwork and a series of lakes, water and sewage systems, a clubhouse and a swimming pool, park areas, and walking trails.
Smith thereafter petitioned the Odenville town council to create the planned improvement district, and, on January 14, 2008, the Odenville town council adopted a resolution granting the petition and creating the Twelve Oaks Improvement District ("the District"). The District's board of directors consisted of Smith; Smith's brother Billy Smith, who was the partner with Smith in B & B Construction, Inc., a construction company that had worked on the Twelve Oaks property; and Fran Mize, a real-estate broker and another business partner of Smith's responsible for marketing Twelve Oaks (hereinafter referred to collectively as "the Board members"). The District subsequently hired WHA to manage the District and EOS as the official engineer for the District, and they thereafter worked toward preparing a bond issue and finding a buyer for the to-be-issued bonds. Ultimately, Allstate Insurance Company ("Allstate") agreed to purchase $4,395,000 worth of bonds issued by the District.
In April 2008, the District petitioned the Odenville town council to adopt a resolution approving the assessments that would be used to secure and pay the bonds to be issued by the District. In support of that petition, the District submitted the engineer's report prepared by Harbison and a methodology report prepared by WHA, which concluded that the $4,395,000 face value of the bonds would require a special assessment of $12,557.14 to be levied upon each of the 350 lots planned for Twelve Oaks, which assessment WHA recommended be payable at the rate of $1,318.67 per year for a 10-year period. The methodology report noted that the $4,395,000 bond issue would raise only $2,959,821 that would be available for the development of Twelve Oaks, because $993,870 of the bond proceeds would be set aside for capitalized interest and a debt-service reserve fund and the remainder of the bond proceeds would be paid out as costs and fees associated with the issuance of the bonds, which would be underwritten by another firm affiliated with Hunt-Gardnyr Michael Capital. The methodology report also noted that an additional $2,658,179 would still be needed to finish the estimated $5,618,000 of infrastructure improvements needed to complete Twelve Oaks; however, the methodology report did not indicate where those funds would come from. The Odenville town council thereafter adopted a resolution setting the assessments at the requested level, and the District then adopted its own resolution authorizing the issuance of the bonds.
On June 6, 2008, the District filed a bond-validation petition in the St. Clair Circuit Court pursuant to § 11-81-221, Ala. Code 1975, which "allows a public corporation to 'determine its authority to issue ... obligations and the legality of all proceedings had or taken in connection therewith,' and 'the validity of the tax or other revenues or means provided for the payment thereof.' " Houston Cty. Econ. Dev. Auth. v. State, 168 So.3d 4, 21 (Ala. 2014) (quoting § 11-81-221 ). On July 2, 2008, the trial court entered a final judgment confirming the validity and enforceability of the bonds and the assessments securing them. No appeal was filed, and it was thus established that the bonds and the assessments providing for their payment could "never *905 be called in question in any court in this state." § 11-81-224, Ala. Code 1975.
On July 14, 2008, Smith met with Doug Williamson, the Aliant officer responsible for the Aliant loan, and informed him that the bonds were ready to be issued but that the District could not proceed until Aliant executed a "mortgagee special assessment acknowledgment" that would subordinate Aliant's interest in the Twelve Oaks property to the interests of the bondholders; Aliant alleges that this was the first time it was informed that it would be asked to subordinate its interest in the Twelve Oaks property. Williamson alleges that Smith and the District's attorney made various representations to him during that meeting and over the course of the next several days regarding the viability of Twelve Oaks and the controls that would be placed upon the use of the bond proceeds and that, based upon those and other representations made by Smith, as well as upon written representations made in the engineer's report prepared by Harbison and other materials prepared by WHA, he agreed to execute the mortgagee-special-assessment acknowledgment on behalf of Aliant, doing so on July 24, 2008.
On July 31, 2008, the bonds were issued, and the bond proceeds were split into a series of trust accounts maintained by U.S. Bank, N.A., which, pursuant to the District's agreement with Allstate, had been selected to serve as trustee of those accounts. Pursuant to the terms of the trust indenture, the District could access the $2,959,821 available for the construction of improvements only upon filing a request for reimbursement and providing appropriate documentation describing the work that had been completed and the costs that had been incurred; such requests then had to be signed and approved by both a District board member and Harbison or another EOS engineer. Unbeknownst to Aliant, however, Odenville had, on November 26, 2007-before the District had even been officially created-adopted a resolution authorizing Twelve Oaks Properties, Inc., to be reimbursed from the future bond proceeds for improvements made to the Twelve Oaks property before the bonds were issued. In accordance with that resolution, Smith filed a request for reimbursement on behalf of Twelve Oaks Properties on August 8, 2008-eight days after the bonds were issued-seeking $1,181,962 from the bond proceeds for work completed before the bonds were issued. Smith approved the request on behalf of the District, and, after Harbison approved the request as District engineer, the requested payment was made. On September 10, 2008, Smith submitted another request for reimbursement seeking $541,866, of which $306,951 was for work performed before the bonds were issued. That request was also approved by Harbison, and the bond proceeds were disbursed as requested.
In the following months, virtually all the remaining bond proceeds were paid out, and by March 2010 only $9,500 remained. Aliant alleges that little progress was made at Twelve Oaks during this time. The trust accounts holding reserves were exhausted by late 2010 as well, and eventually neither the District nor Smith and his affiliated companies were able to make future payments on the bonds when they became due. In early 2011, Four Star Investments defaulted on the Aliant loan, and, on May 2, 2011, Aliant sued Four Star Investments and Smith alleging that they had breached the terms of their loan and guarantee agreements. On September 26, 2011, the trial court entered a $2,241,288 judgment in favor of Aliant in that action (hereinafter referred to as "the default action").
Aliant thereafter began conducting postjudgment discovery seeking to learn more *906 about the assets of Four Star Investments and Smith. During that process, Aliant learned more details regarding the creation of the District, the development of Twelve Oaks, and how the bond proceeds had been used. On March 30, 2012, Aliant, based on the information it had discovered, filed another lawsuit asserting various claims related to the development of Twelve Oaks. As eventually amended, Aliant's final complaint asserted nine counts against various individuals and entities. Those defendants can be categorized as follows: (1) "The Twelve Oaks defendants," including Four Star Investments, Twelve Oaks Properties, the District, Smith, Billy Smith, Mize, and B & B Construction; (2) Hunt and his management company WHA; (3) "the EOS defendants," including Harbison and his engineering firm EOS; and (4) Allstate and U.S. Bank.[1] The gravamen of Aliant's claims is that those defendants combined to commit a number of wrongful acts that siphoned all equity from the Twelve Oaks development and that, while the defendants had individually profited from those acts, Aliant had been injured inasmuch as its security interest in the Twelve Oaks property had been rendered worthless because the property was now encumbered by assessments that had a total value in excess of the market value of the Twelve Oaks property.
The defendants eventually all moved the trial court either to dismiss the claims asserted against them or to enter summary judgments in their favor. Through a number of orders entered between April 2015 and April 2016, the trial court dismissed some of the claims asserted by Aliant against Smith, Four Star Investments, Allstate, and U.S. Bank and entered summary judgments in favor of the defendants on all the remaining claims. Aliant subsequently filed four appeals with this Court: appeal no. 1150637 (challenging the judgments entered in favor of Allstate and U.S. Bank); appeal no. 1150822 (challenging the judgments entered in favor of the Twelve Oaks defendants); appeal no. 1150823 (challenging the judgments entered in favor of Hunt and WHA); and appeal no. 1150824 (challenging the judgment entered in favor of the EOS defendants). We consolidated the four appeals for the purpose of writing one opinion; however, the parties to appeal no. 1150637 subsequently settled their dispute, and that appeal has since been dismissed.
II.
The trial court disposed of each claim asserted by Aliant in this case either by dismissing the claim or by entering a summary judgment in favor of the defendant against which the claim was asserted; Aliant argues that the trial court erred in both respects. With regard to those claims that were dismissed, this Court has stated:
"The appropriate standard of review of a trial court's [ruling on] a motion to dismiss is whether 'when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle [the pleader] to relief.' Nance v. Matthews, 622 So.2d 297, 299 (Ala. 1993) ; Raley v. Citibanc of Alabama/Andalusia, 474 So.2d 640, 641 (Ala. 1985). This Court does not consider whether the plaintiff will ultimately prevail, but only whether the plaintiff may possibly prevail. Nance, 622 So.2d at 299. A 'dismissal is proper only when it appears beyond doubt that *907 the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief.' Nance, 622 So.2d at 299 ; Garrett v. Hadden, 495 So.2d 616, 617 (Ala. 1986) ; Hill v. Kraft, Inc., 496 So.2d 768, 769 (Ala. 1986)."
Lyons v. River Road Constr., Inc., 858 So.2d 257, 260 (Ala. 2003). We review the summary judgments entered by the trial court under the following standard:
"This Court's review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala. 2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce 'substantial evidence' as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989) ; Ala. Code 1975, § 12-21-12."
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala. 2004).
III.
Aliant's final amended complaint asserted nine counts, with each count including claims against multiple defendants. However, we note that Aliant has not, in its briefs to this Court, addressed the trial court's disposition of the first three asserted counts-labeled "judicial foreclosure," "declaratory judgment and bill to quiet title," and "unjust enrichment"-and Aliant has accordingly waived any argument that the trial court acted in error in its disposition of those counts. See Bogle v. Scheer, 512 So.2d 1336, 1337 (Ala. 1987) ("The plaintiff filed a five-count complaint .... [O]n appeal he has argued only that a summary judgment was not proper on the conspiracy count (count four). Because issues not argued in brief are waived, ... our review is limited to whether the summary judgment was proper on the conspiracy count.").[2] We consider the rest of the counts asserted by Aliant in the order in which they were presented.
Count four of Aliant's final amended complaint asserts negligence and breach-of-fiduciary-duty claims against WHA and the individual Board members-Smith, Mize and Billy Smith. "The elements of a negligence claim are a duty, a breach of that duty, causation, and damage." Armstrong Bus. Servs., Inc. v. AmSouth Bank, 817 So.2d 665, 679 (Ala. 2001) (citing AALAR, Ltd. v. Francis, 716 So.2d 1141, 1144 (Ala. 1998) ). Similarly, the elements of a breach-of-fiduciary-duty claim are the existence of a fiduciary duty, a breach of that duty, and damage suffered as a result of that breach. Regions Bank v. Lowrey, 101 So.3d 210, 219 (Ala. 2012).
*908 Aliant alleges in its complaint that WHA and the Board members had a duty to responsibly manage and oversee the District and that Aliant was damaged after they
"breached their duties by, among other things, failing to exercise their independent professional judgment and analysis related to the feasibility of the [bond] issue, by failing to properly supervise and monitor the spending of the [bonds] on the premises, by failing to assure that the requisitions were proper and for work actually performed, by failing to properly monitor and supervise the construction of the promised improvements, by mismanaging the funds [so] that only a small portion of the promised improvements were completed, and by otherwise failing to carry out the responsibilities of their job."
The determination whether a duty exists is generally a question of law for the court to decide. Ex parte BASF Constr. Chems., LLC, 153 So.3d 793, 801-02 (Ala. 2013). With regard to Aliant's claims against the Board members, like the board of directors governing any corporate body the Board members had the duty to act with care and the duty to act with loyalty. See Massey v. Disc Mfg., Inc., 601 So.2d 449, 456 (Ala. 1992) ("The corporate fiduciary duty is divided into two parts: (1) a duty of care; and (2) a duty of loyalty."). Although the board of directors of a typical for-profit corporation owe those duties to the corporation and its shareholders, see, e.g., Jones v. Ellis, 551 So.2d 396, 401 (Ala. 1989), the District is a public corporation with no shareholders. However, just as a for-profit corporation exists primarily to maximize profit for the benefit of its shareholders, the District exists primarily to benefit those owning property within its boundaries; accordingly, the Board members owe their duties to owners of property within the District. Inasmuch as Alabama is a "title theory" state, Aliant, which at all relevant times held a mortgage on the Twelve Oaks property, must be included among those to whom the Board members owed a duty of care and a duty of loyalty. See Maiden v. Federal Nat'l Mortg. Ass'n, 69 So.3d 860, 865 (Ala. Civ. App. 2011) ("Alabama is a 'title theory' state; thus, when a person mortgages real property, the mortgagee obtains legal title to the real property ....").
Having held that the Board members did owe certain duties to Aliant, we also hold that Aliant met its burden of putting forth substantial evidence establishing that a genuine issue of material fact exists with regard to the other elements of its negligence and breach-of-fiduciary-duty claims against the Board members. The affidavit of Aliant's expert Marcus A. Watson in particular described the problematic nature of the actions taken by the Board members, especially in light of the fact that they were all related parties inasmuch as they shared business interests in various entities involved in the development of Twelve Oaks.
In their combined brief to this Court, the Twelve Oaks defendants do not argue that Aliant failed to submit substantial evidence establishing its negligence and breach-of-fiduciary-duty claims against the Board members. Rather, they argue that all the Twelve Oaks defendants were entitled to a summary judgment on all the claims asserted against them by Aliant on the basis of several affirmative defenses, specifically, immunity, res judicata and collateral estoppel, and the statute of limitations. In its order entering a summary judgment in favor of the Twelve Oaks defendants, the trial court in fact agreed that all the claims asserted by Aliant were barred by the doctrines of res judicata or *909 collateral estoppel and by the statute of limitations. The trial court also cited those affirmative defenses when entering summary judgments in favor of the other defendants on the claims asserted in Aliant's final amended complaint. For the reasons that follow, we disagree that all of Aliant's claims are barred by the doctrines of res judicata and collateral estoppel and by the statute of limitations; the defendants' general arguments in this regard are without merit. Nevertheless, there are specific facts relevant to some of the claims asserted against individual defendants such that those claims are barred by principles of immunity or the appropriate statute of limitations. Those exceptions are discussed in subsequent sections of this opinion; no affirmative defenses bar the negligence and breach-of-fiduciary duty claims asserted against the Board members, however, and our analysis of the general immunity, res judicata/collateral-estoppel, and statute-of-limitations arguments they make is equally applicable to the similar arguments made by the other defendants.
The Board members first argue that they are entitled to immunity based on the Alabama Improvement District Act, which provides, in part:
"Districts, the members of the board, its officers, and agents shall have the same immunity from liability as a municipality and its officers. No civil action shall be brought or maintained against the district or any director thereof for or on account of the negligence of a district or director or its or his or her agents, servants, or employees in or about the construction, acquisition, installation, maintenance, operation, superintendence, or management of any facility or other improvement owned, controlled, maintained, or managed by the district."
§ 11-99A-7, Ala. Code 1975. Emphasizing the second sentence in this section, the Board members argue that no action in negligence can be brought against them based on their actions related to managing and operating the District. They further argue that § 11-47-190, Ala. Code 1975, which sets forth the immunity that applies to municipalities and their officers, operates to bar any action against them based on intentional torts as well; § 11-47-190 provides, in pertinent part:
"No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty ... and whenever the city or town shall be made liable for damages by reason of the unauthorized or wrongful acts or negligence, carelessness, or unskillfulness of any person or corporation, then such person or corporation shall be liable to an action on the same account by the party so injured."
We disagree that these two statutes apply in this case to bar the claims asserted by Aliant in count four of its final amended complaint. Section 11-99A-7 is clear that the legislature intended an improvement district and its board members to have "the same immunity from liability as a municipality and its officers," and § 11-47-190 provides that a municipality can be sued for the negligent acts of its agents and that, if a municipality is the subject of a lawsuit as a result of the negligence of an agent, "then such person ... shall be liable to an action on the same account by the party so injured." See, e.g., Morrow v. Caldwell, 153 So.3d 764 (Ala. 2014) (recognizing that under § 11-47-190 a municipality can be sued based upon the negligence of its agent, while the agent can be sued in *910 his or her individual capacity for both negligent and intentional acts). Reading these two statutes together, the sentence in § 11-99A-7 indicating that no claim can be pursued against a director of an improvement district "for or on account of the negligence of a district or director or its or his or her agents, servants, or employees" must operate only to bar a negligence claim from being asserted against a director based upon the negligence of some other party-not the director's own negligence. This is consistent with how immunity is applied to cases involving municipal employees. See, e.g., Newton v. Town of Columbia, 695 So.2d 1213, 1218 (Ala. Civ. App. 1997) ("[A] municipality's chief executive is not vicariously liable for the misconduct of his or her subordinates."). In this case, the Board members are being sued based on their own alleged wrongdoing, not the actions of each other or some other agents. Accordingly, § 11-99A-7 does not bar the negligence and breach-of-fiduciary duty claims asserted by Aliant against the Board members.
We next consider the Board members' argument that they are entitled to a summary judgment based on the doctrines of collateral estoppel and res judicata. The trial court agreed, stating in its order granting their motion for a summary judgment:
"On May 2, 2011, Aliant filed suit previously in this court against codefendants [Smith] and Four Star [Investments] about the same loan they now complain about. On October 13, 2011, the court entered a judgment against Four Star [Investments] and [Smith] in the amount of $2,241,287.75 as a consequence of their default under the loan transactions. This order represents a final, binding adjudication of Aliant's claims concerning the loan on the Twelve Oaks property. Indeed, this court has previously held Aliant was estopped from bringing tort claims against [Smith].
"Collateral estoppel applies when '(1) an issue in a prior action was identical to the issue litigated in the present action; (2) the issue was actually litigated in the prior action; (3) resolution of the issue was necessary to the prior judgment; and (4) the same parties are involved in the two actions.' Lee L. Saad Constr. Co. v. DPF Architects, P.C., 851 So.2d 507, 520 (Ala. 2002). Here, (1) Aliant is suing over the very same issue-[the Aliant loan]; (2) the loan was previously litigated to a final judgment; (3) resolution of the loan was necessary for the prior judgment; and (4) Aliant, Four Star [Investments], and [Smith] were all parties to both cases. Aliant is the same party seeking to relitigate the same loan. See Whisman v. Alabama Power Co., 512 So.2d 78, 82 (Ala. 1987) ('The party identity criterion does not require complete identity, but only that the party against whom res judicata is asserted was either a party or in privity with a party to the prior action ....'). Because the elements of collateral estoppel have been met, Aliant is estopped from prosecuting this suit over the very same loan.
"Aliant's claims are precluded in this case. Aliant has already brought suit on this very same loan and obtained a judgment. Because Aliant seeks to relitigate the same issues as those in [the prior action], its claims are barred.
" 'If a claim, which arises out of a single wrongful act or dispute, is brought to a final conclusion on the merits, then all other claims arising out of that same wrongful act or dispute are barred, even if those claims are based on different legal theories or seek a different form of damages, unless the evidence necessary to establish the elements of the alternative *911 theories varies materially from the evidence necessary for a recovery in the first action.'
" Equity Resources Mgmt., Inc. v. Vinson, 723 So.2d 634, 638 (Ala. 1998).
"The prior judgment is res judicata. See Martin v. Cash Express, Inc., 60 So.3d 236, 241 (Ala. 2010) ('[A] judgment or decree by consent is as conclusive between them and their privies as if the suit had been an adversary one and rendered after a trial on the facts.'); see Whisman v. Alabama Power Co., 512 So.2d 78, 82 (Ala. 1987) ('The issue has been litigated and, if the defense is asserted, the prior litigation will preclude this issue from being relitigated.'). Since Aliant has already litigated its claim on the loan at issue and obtained a judgment, it cannot now relitigate the issue under a different theory."
This Court has explained that "[r]es judicata and collateral estoppel are two closely related, judicially created doctrines that preclude the relitigation of matters that have been previously adjudicated or, in the case of res judicata, that could have been adjudicated in a prior action." Lee L. Saad Constr. Co. v. DPF Architects, P.C., 851 So.2d 507, 516 (Ala. 2002). Essentially, the doctrine of collateral estoppel operates to bar the relitigation of issues actually litigated in a previous action, while the doctrine of res judicata bars the litigation of claims that were or could have been litigated in a previous action. Lee L. Saad, 851 So.2d at 516-17. Aliant argues that neither doctrine has application here because, it says, the default action was limited to determining whether Four Star Investments had breached an agreement to repay a promissory note secured by a mortgage on the Twelve Oaks property and whether Smith had breached an accompanying agreement personally guaranteeing Four Star Investments' debt. Thus, Aliant argues, collateral estoppel does not apply because, it says, the issues surrounding the claims raised in the instant action-such as whether the Board members breached any duties they owed Aliant and whether any of the defendants made misrepresentations to Aliant-were not litigated in the previous action, and, Aliant argues, res judicata does not apply because, it says, the claims asserted in the instant action were not and could not have been asserted in the previous action. We agree.
With regard to collateral estoppel, the trial court and the Board members broadly identify the issue litigated in a prior action and the issue Aliant allegedly now seeks to relitigate as being the Aliant loan. However, although the Aliant loan is certainly a relevant part of both actions, it is not itself an "issue" that may be the subject of collateral estoppel. As explained in Lee L. Saad, collateral estoppel operates to prevent the relitigation of factual issues that have already been decided in a prior action. 851 So.2d at 519. Thus, factual issues relating to the Aliant loan that were decided in the default action-such as whether Four Star Investments had executed a valid promissory note with Aliant, whether Smith had personally guaranteed Four Star Investments' debt, and whether those agreements were breached-cannot be relitigated in the instant or any other action; collateral estoppel precludes it. However, the factual issues that must be resolved to decide the negligence, fraud, and other claims now asserted by Aliant against the Board members and other defendants in the instant action-such as whether any duties were breached and whether any misrepresentations were made-were undisputedly not considered in the default action; those issues simply were not relevant to whether Four Star Investments and Smith breached their loan and guarantee agreements. Inasmuch as the doctrine *912 of collateral estoppel bars the relitigation only of "issues actually decided in a former action," it is without effect in this case. Leverette v. Leverette, 479 So.2d 1229, 1237 (Ala. 1985) (emphasis added).
We next turn to the Board members' argument that Aliant's claims against them are barred by the doctrine of res judicata. In essence, even though we have concluded that the factual issues relevant to Aliant's present claims were not actually decided in the default action, we must still determine whether Aliant could have asserted its present claims in the default action, thus putting those factual issues before the court at that time. See Dairyland Ins. Co. v. Jackson, 566 So.2d 723, 725 (Ala. 1990) (explaining that res judicata will bar further litigation of "any claim that was or could have been adjudicated in the prior action"). The Board members argue that the doctrine of res judicata bars Aliant's present claims "because the matters in the [instant] action involve the same wrongful act and dispute (i.e., non-payment of the [Aliant] loan) as was at issue in the first action. This is true regardless of what name or title that Aliant may use to describe its claims." The Twelve Oaks defendants' brief, pp. 30-31. Aliant, however, argues that the default action was essentially just a simple breach-of-contract case involving one wrongful act-the failure to pay moneys owed by contract-while the instant action encompasses entirely different claims based on other wrongs, such as the breaching of duties and the making of misrepresentations. Moreover, Aliant argues, it could not have asserted its present claims in the default action because, it alleges, it did not discover the facts supporting the present claims until after the default action was resolved.
The elements of res judicata are (1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits. Equity Res. Mgmt., Inc. v. Vinson, 723 So.2d 634, 636 (Ala. 1998) The only element now disputed by the parties is the fourth-whether the cause of action in the instant case is the same as the cause of action in the default action. This Court has explained the factors relevant to making that determination:
"The determination of whether the cause of action is the same in two separate suits depends on whether the issues in the two actions are the same and whether the same evidence would support a recovery for the plaintiff in both suits. Dominex, Inc. v. Key, 456 So.2d 1047, 1054 (Ala. 1984). Stated differently, the fourth element is met when the issues involved in the earlier suit comprehended all that is involved in the issues of the later suit. Adams v. Powell, 225 Ala. 300, 142 So. 537 (1932)."
Dairyland Ins., 566 So.2d at 726. See also Chapman Nursing Home, Inc. v. McDonald, 985 So.2d 914, 921 (Ala. 2007) (explaining that res judicata applies to all legal theories and claims arising out of the same nucleus of operative facts and that two causes of action are the same for res judicata purposes when the same evidence is applicable in both actions).
In considering those factors, we cannot agree with the trial court that the claims now asserted by Aliant are essentially the same as the claim asserted by Aliant in the default action. The evidence that Aliant presented in the default action indicated that Four Star Investments and Smith executed and subsequently breached agreements with Aliant and supported a recovery for Aliant on the breach-of-contract claims asserted in the default action. However, that evidence would not support and *913 is not needed to prove Aliant's present claims of negligence, breach of fiduciary duties, fraud, conspiracy, and wantonness. Those claims are based on separate and distinct actions, not directly related to the Aliant loan, that were allegedly taken by the Board members and other defendants, and separate evidence is needed to establish those claims. For example, with regard to the negligence and breach-of-fiduciary-duty claims asserted against the Board members, that evidence would include evidence of the actions the Board members took in their official capacities and whether those actions were sufficient to fulfill the duties they owed Aliant. Accordingly, the doctrine of res judicata does not bar Aliant from asserting its present claims.
Our conclusion that the doctrines of res judicata and collateral estoppel do not apply in this case is supported by this Court's decision in Benetton S.p.A. v. Benedot, Inc., 642 So.2d 394 (Ala. 1994), a similar case in which it was alleged that a previous action between parties in which a judgment was entered on a debt operated as res judicata to bar a subsequent action between the same parties. Benetton involved a dispute between the Italian clothing manufacturer Benetton and its United States subsidiary and sales representatives (hereinafter referred to collectively as "Benetton"), on the one hand, and Al-Ben, Inc., an Alabama company that had contracted with Benetton to operate certain Benetton stores in Alabama, on the other hand. 642 So.2d at 396. Al-Ben had had a tumultuous relationship with Benetton from the beginning, alleging that Benetton failed to complete its obligations so that the stores could open when originally planned and that Benetton constantly sent it unordered and unwanted merchandise that had to be sold for a loss. Ultimately Al-Ben sued Benetton asserting claims of fraud, conspiracy, and breach of contract.
Benetton separately sued the owners of Al-Ben in federal district court, alleging that the owners had personally guaranteed debt Al-Ben had incurred for merchandise received from Benetton, and Benetton ultimately obtained a judgment in its favor on this claim. 642 So.2d at 397. Al-Ben thereafter was awarded $1,500,000 in the state-court action, and Benetton appealed that judgment to this Court, arguing that Al-Ben's fraud, conspiracy, and breach-of-contract claims should have been barred by the doctrines of res judicata and/or collateral estoppel based on the earlier judgment entered by the federal district court. 642 So.2d at 398-99. In rejecting Benetton's res judicata argument, this Court applied the "same-evidence" test discussed supra, stating:
"We cannot say that the same cause of action is present in both actions. [Al-Ben's owners'] liability, through personal guarantees, for Al-Ben's debt based on unpaid invoices does not involve the issues of fraud, conspiracy, and breach of contract. The first action does not involve the issues raised in the second action, and the same evidence would not support a recovery for the plaintiffs in both actions. Therefore, the doctrine of res judicata does not bar Al-Ben's action against Benetton based on fraud, conspiracy, and breach of contract."
Benetton, 642 So.2d at 400. The Benetton Court also declined to apply the doctrine of collateral estoppel, noting that the federal district court had not decided any factual issues relevant to the state-court action because the federal district court had entered a judgment representing only the amount Al-Ben's owners conceded they owed; the federal district court had made no judgment on debt attributable to merchandise Al-Ben's owners claimed they had not wanted or ordered. Id.
*914 Applying Benetton to the facts of this case, we note that Four Star Investments' and Smith's liability for the Aliant loan did not involve issues of negligence, breach of fiduciary duties, fraud, conspiracy, and wantonness. The default action did not involve the issues raised in the instant action, and the same evidence would not support a recovery for Aliant in both actions. Accordingly, the doctrine of res judicata does not bar the instant action. Moreover, because the Board members and other defendants have not identified any issue that was actually litigated in the default action that Aliant is seeking to relitigate in this action, the doctrine of collateral estoppel is inapplicable as well.
Finally, the Board members also argue that Aliant's negligence and breach-of-fiduciary-duty claims against them are barred by the applicable statute of limitations. The trial court held, and the Board members argue, that Aliant suffered injury (1) when it closed the Aliant loan in August 2007; (2) when it agreed to subordinate its security interest in the Twelve Oaks property in July 2008; and (3) when the bond proceeds were disbursed to Smith, his companies, and others beginning in 2008. Accordingly, they argue, Aliant's tort claims accrued, at the latest, in 2008, and the applicable two-year statute of limitations, see § 6-2-38(l ), Ala. Code 1975, bars the claims now asserted inasmuch as Aliant did not initiate this action until March 2012. They further argue that Aliant was aware, at the time the bonds were issued, of the general process by which the bond proceeds would be disbursed and that Aliant knew that it could inspect the Twelve Oaks property to view construction progress at any time but apparently failed to do so; accordingly, they argue, Aliant should have been aware of its potential claims within that two-year period and it cannot rely on the discovery rule of § 6-2-3, Ala. Code 1975. See generally DGB, LLC v. Hinds, 55 So.3d 218, 224 (Ala. 2010) (explaining that, pursuant to § 6-2-3, if a potential tort claim has been fraudulently concealed, the two-year statute of limitations generally applicable to such a claim will be tolled until the plaintiff discovers the fraud).
Aliant disputes the trial court's conclusion and the Board members' argument that it suffered injury in 2008 and that the statute of limitations began to run at that time. Aliant argues that, although much of the malfeasance allegedly committed by the various defendants occurred during that time, Aliant remained unaware of that fact for several years, and it suffered no legal injury until early 2011, when Four Star Investments defaulted on the Aliant loan. Aliant accordingly argues that § 6-2-3 applies and that its March 2012 complaint was timely.
In support of its argument, Aliant relies heavily upon Bryant Bank v. Talmage Kirkland & Co., 155 So.3d 231 (Ala. 2014), which it alleges mirrors this case. In that case, a bank relied upon an appraisal conducted in December 2007 valuing a property at $1,700,000 to issue a commercial mortgage loan that same month. 155 So.3d at 233. After the borrower defaulted in October 2008, the bank ordered a new appraisal of the property from a different company, which concluded that the property was worth only $205,000. In July 2010, the bank sued the appraisers, alleging negligent misrepresentation and breach of contract. The appraisers thereafter successfully moved the trial court to enter a summary judgment in their favor on the negligent-misrepresentation claim, and the bank appealed that judgment to this Court. On appeal, the appraisers argued that the bank's claim accrued in December 2007 when the loan was made and that the bank's July 2010 complaint was accordingly *915 filed outside the two-year limitations period. 155 So.3d at 238. The bank, however, argued that the claim did not accrue until "it incurred damage as a result of [the borrower's] default on the loan." 155 So.3d at 237. This Court ultimately declined to affirm the summary judgment on the basis of the appraisers' statute-of-limitations argument, explaining:
"No evidence was presented indicating that [the bank] had actual knowledge-for more than two years before commencing this action-that the appraisal was conducted in a negligent manner. Accordingly, [the bank's] negligent-misrepresentation claim accrued when a reasonable person would have discovered the fraud-a question within the purview of the jury. Because a genuine issue of material fact exists as to when [the bank] discovered facts that would have caused a reasonable person to inquire and led to the discovery of the fraud giving rise to [the bank's] negligent-misrepresentation claim, the defendants were not entitled to a summary judgment on the basis that the statute of limitations had run on its negligent-misrepresentation claim. ..."
Bryant Bank, 155 So.3d at 238.
There is likewise no evidence in this case establishing that Aliant had actual knowledge of the facts that form the basis of its claims at the time they were occurring. The Board members and other defendants argue that Aliant should have taken steps to discover those facts based on the lack of progress Aliant alleges it saw at Twelve Oaks during the time the bond proceeds were being depleted; however, Williamson gave sworn testimony indicating that he concluded, based on the lack of construction activity he witnessed, that development had been temporarily put on hold during this time and that the bond proceeds were accordingly not being disbursed. Williamson further explained that Aliant had no role in the disbursement of the bond proceeds, which were held by U.S. Bank, as trustee, and were disbursed after requests for reimbursement were approved by EOS and the District, and that Aliant received no invoices and had no right to access the relevant bank records. Under these facts, the question of when Aliant's tort claims accrued is a question for the jury; a court cannot properly decide as a matter of law when a reasonable person should have discovered that claims had been fraudulently concealed unless the evidence is undisputed. See Bryant, 155 So.3d at 237 (explaining that the issue of when a reasonable person would have discovered fraud is generally a question of fact for the jury that can be decided as a matter of law only when the facts are undisputed and the evidence supports but one conclusion). The summary judgment entered by the trial court in favor of the Board members on Aliant's negligence and breach-of-fiduciary-duty claims cannot be affirmed on statute-of-limitations grounds and is due to be reversed.
Count four of Aliant's complaint also asserts negligence and breach-of-fiduciary-duty claims against WHA. Aliant maintains that, like the Board members, WHA had a duty to responsibly manage and oversee the District and that it breached that duty in several respects noted above in the discussion of the similar claim made against the Board members. WHA argues that it had no fiduciary relationship with Aliant and that it owed no duty to Aliant-fiduciary or otherwise. For the reasons that follow, we agree.
With regard to Aliant's breach-of-fiduciary-duty claim against WHA, the trial court stated:
"Aliant has also failed to establish that WHA owed it a fiduciary duty, as the facts indicate Aliant had no relationship, *916 conversations, or communications with WHA. Without a relationship between WHA and Aliant a duty cannot be established much less a fiduciary duty. Aliant's own representative specifically testified that he was not aware of any relationship between [Aliant and] WHA much less a fiduciary relationship between the two entities.
"In Alabama, a fiduciary or confidential relationship [has been] defined [as follows]:
" ' " 'A confidential relationship is one in which one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.' " '
" DGB, LLC v. Hinds, 55 So.3d 218, 233 (Ala. 2010) (quoting Bank of Red Bay v. King, 482 So.2d 274, 284 (Ala. 1985), quoting in turn 15A C.J.S. Confidential (1967)).
"Further, a fiduciary relationship is defined as:
" '[a] relationship in which one person is under a duty to act for the benefit of another on matters within the scope of the relationship .... Fiduciary relationships usually arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer.'
" Swann v. Regions Bank, 17 So.3d 1180, 1193 (Ala. Civ. App. 2008) (quoting Black's Law Dictionary, 1315 (8th. 2004)).
"Aliant's corporate representatives testified that there was never any relationship between WHA and Aliant. Mr. [Craig] Wrathell[, the president] of WHA[,] also testified that he did not have any communications with Aliant. Since Aliant has not provided substantial evidence that WHA owed it a fiduciary duty, summary judgment is granted in WHA's favor on the breach-of-fiduciary-duty count."
Aliant has identified no evidence that would refute the trial court's conclusion that Aliant had no relationship with WHA, much less a confidential or fiduciary relationship. Notably, this is not a case where we must determine whether the parties engaged in arm's length dealing or whether there was a fiduciary relationship; rather, it is undisputed that Aliant and WHA did not deal with each other at all-there was no relationship between them. In light of this undisputed evidence, we agree with the trial court that WHA owed Aliant no fiduciary duties, and the summary judgment *917 entered in favor of WHA on Aliant's breach-of-fiduciary-duties claim is accordingly due to be affirmed. We further note that, although Aliant in its brief cites several cases to support its argument that WHA owed it a general duty of care, the alleged breach of which forms the basis of Aliant's negligence claim, it has cited no caselaw to support its argument that WHA owed it specific fiduciary duties.
The final remaining claim asserted by Aliant in count four is its negligence claim against WHA. Aliant argues that it was injured as a result of WHA's alleged failure to act with care and skill in its role as manager of the District. WHA's duties as manager of the District were outlined in a management agreement between it and the District; however, it is undisputed that Aliant was not a party to that contract. Aliant accordingly acknowledges the general rule in Alabama that "where the charge of negligence is based upon breach of duty arising out a contractual relationship, no cause of action arises in favor of one not in privity to the contract." Federal Mogul Corp. v. Universal Constr. Co., 376 So.2d 716, 724 (Ala. Civ. App. 1979). However, citing Berkel & Co. Contractors, Inc. v. Providence Hospital, 454 So.2d 496 (Ala. 1984), and Cincinnati Insurance Cos. v. Barber Insulation, Inc., 946 So.2d 441 (Ala. 2006), Aliant argues that it is entitled to rely on an exception to that general rule that applies when the defendant negligently performed its contract with knowledge that others were relying on its proper performance. See also Williams v. Jackson Co., 359 So.2d 798, 801 (Ala. Civ. App. 1978) ("Thus one who undertakes to perform a contract may be determined to owe a duty to others not privy to the contract to perform his obligations under the contract without negligent injury to such others. Such duty may arise from the foreseeability that such others may be injured by negligent performance, or duty may arise from the knowledge that others are relying upon a proper performance."). Inasmuch as Aliant's arguments are based primarily upon Providence Hospital and Barber, we begin with an analysis of those cases.
Providence Hospital involved negligence claims against a hospital and its architect asserted by a subcontractor hired to install piling supports for an addition to the hospital. 3 454 So.2d at 499. The hospital's architect directed the subcontractor's construction of the piling supports, and, after the piling supports failed, the subcontractor sued, alleging that the hospital and its architect breached their duties of care in directing the construction. 454 So.2d at 500. After a summary judgment was entered in favor of the hospital, the subcontractor appealed to this Court, which reversed the summary judgment, explaining that the hospital did owe a duty of care to the subcontractor:
"[The hospital] argues further that even if privity is not a defense, the facts disclosed that no duty was owed to [the subcontractor]. In deciding whether to impose a duty in a construction context, the trial court should analyze six factors:
" ' "(1) [T]he extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm." '
*918 " Howe v. Bishop, 446 So.2d 11 (Ala. 1984) (Torbert, C.J., concurring in the result), quoting from United Leasing Corp. v. Miller, 45 N.C.App. 400, 406-07, 263 S.E.2d 313, 318 (1980). Under this standard, [the hospital] clearly owes [the subcontractor] a duty to act reasonably in directing and approving pile construction work. The transaction was intended to affect [the subcontractor], and it was foreseeable that it would. The alleged harm is certain and directly connected to [the hospital's] conduct. Given the business relationship and lack of personal injury, the question of moral blame is not relevant in this case. The final factor, the policy of preventing future harm, also supports the finding of duty. [The hospital] could have averted the alleged loss either by not acting or by acting reasonably. This Court will impose liability on [the hospital] to require it to act responsibly.
"This argument for a legal duty is especially compelling because [the hospital] and its architect had the power through liquidated damages and other means to force [the subcontractor] to do as [the hospital] wished. The court in United States v. Rogers & Rogers, 161 F.Supp. 132, 136 (S.D. Cal. 1958), explained the responsibilities arising from unequal positions in the context of contractor and architect:
" 'Altogether too much control over the contractor necessarily rests in the hands of the supervising architect for him not to be placed under a duty imposed by law to perform without negligence his functions as they affect the contractor. The power of the architect to stop the work alone is tantamount to a power of economic life or death over the contractor. It is only just that such authority, exercised in such a relationship, carry commensurate legal responsibility.'
"Under the circumstances, [the hospital] and its architect owed [the subcontractor] a duty to act reasonably in directing the pile work."
Providence Hospital, 454 So.2d at 502-03. Thus, in Providence Hospital, the Court determined that it was appropriate to find that a duty existed even in the absence of a contract.
In contrast, in Barber this Court determined that no duty was owed where there was no privity between the parties. In Barber, a general contractor was hired to construct a lake house and, during the construction process, that general contractor hired a subcontractor to install insulation in the walls. 946 So.2d at 442. Some time after the completed house was delivered to the homeowners, a pipe in the walls burst, causing extensive water damage, and the homeowners' insurance company subsequently sued the subcontractor responsible for installing the insulation, alleging negligence. After a summary judgment was entered in favor of the subcontractor, the insurance company appealed to this Court, which affirmed the summary judgment after concluding that the subcontractor owed no duty to the homeowners. 946 So.2d at 449. The Barber Court reviewed Providence Hospital at length, distinguishing it as follows:
"Prominent in the Court's analysis [in Providence Hospital ] was the control the architect exercised over the subcontractor's work. [The subcontractor's] own contractual performance depended on the care exercised by the architect; that is, [the subcontractor] was relying on the architect, as the hospital's agent, to exercise due care in 'directing the pile work.' 454 So.2d at 503.
"The element of reliance and the nature of the defendant are the features that most clearly distinguish *919 Providence Hospital from this case. Providence Hospital simply represents the widely recognized rule that architects and similar design professionals may be liable in tort to persons with whom they are not in privity, when it is foreseeable that such persons would detrimentally rely on the professional's representations or performance. ...
"....
"[The insurance company's] contention that the [homeowners] relied on the contract between [the general contractor] and [the subcontractor] falls far short of the particularized reliance of the plaintiffs upon the architect ... in Providence Hospital.... Indeed, [one of the homeowners] testified by deposition that he had 'never heard' of [the subcontractor] prior to this litigation. In fact, it was [the general contractor]-not [the homeowners]-that relied on [the subcontractor]. The [homeowners] relied on [the general contractor], not [the subcontractor]. The absence of reliance and consideration of the six factors set forth in Providence Hospital militate against imposing liability on [the subcontractor].
"....
"In short, [the insurance company] has cited no persuasive authority for imposing on [the subcontractor] a duty to the [homeowners] arising out of its insulation subcontract with [the general contractor]. Thus, the trial court did not err in entering a summary judgment for [the subcontractor]."
Id. at 447-49. The instant case is more akin to Barber than it is to Providence Hospital. First, in Providence Hospital, the fact that the hospital's architect exercised authority over and directed the subcontractor's work was crucial to the Court's holding that the hospital owed the subcontractor a duty. In this case, Aliant seeks to impose a duty upon WHA; however, WHA was never in a position of control over Aliant. Rather, the entity that was in a position of control in this case was the District. The District hired and paid WHA to provide management services, and, under the terms of the management agreement, the District could terminate its relationship with WHA for good cause at any time or for any reason whatsoever upon giving 60 days' written notice. Aliant played no part in that relationship. To paraphrase the Barber Court, the "particularized reliance" that was present in Providence Hospital simply does not exist in this case. 946 So.2d at 448.
When comparing the facts of the instant case to those in Barber, however, it is evident that a similar conclusion that no duty was owed is warranted. Just as the homeowners in Barber had no relationship with the subcontractor, it is undisputed that Aliant had no relationship with WHA. The District, not Aliant, relied upon WHA to provide management and administrative services. For these reasons, the trial court correctly concluded that WHA owed no duty to Aliant, and the summary judgment entered on the negligence claim asserted by Aliant against WHA in count four of its complaint is accordingly due to be affirmed.
IV.
Count five of Aliant's final amended complaint asserts negligence and breach-of-fiduciary-duty claims against the EOS defendants. Aliant argues generally that the EOS defendants failed to perform the engineering services they were hired by the District to perform with the skill and care required by the recognized standards of the engineering profession. In its final amended complaint, Aliant specifically identifies the following ways in which the EOS defendants were alleged to have failed in their duties:
*920 "1) by failing to properly monitor and supervise the construction of the planned improvements; 2) by failing to monitor the use of the [bond] funds; 3) by failing to independently confirm that requisition requests submitted for reimbursement from bond funds contained invoices that had not been altered, were proper and/or were for work actually performed; 4) by relying upon representations of [Smith] about the progress of the development without independent knowledge or verification; 5) by failing to understand the development, including verification of which phases they were reviewing; 6) by submitting false and misleading progress reports about the actual progress of the development and implementation of the promised improvements; and 7) by otherwise failing to carry out their professional responsibilities."
As the Board members and WHA argued with regard to the negligence and breach-of-fiduciary-duty claims asserted against them in count four of Aliant's final amended complaint, the EOS defendants first argue that the summary judgment entered in their favor on the similar claims asserted against them should be affirmed on grounds of immunity, res judicata/collateral estoppel, and statute of limitations. In many respects, their arguments on these points are effectively the same arguments advanced by the Board members and rejected by this Court in Part III of this opinion; however, the facts underlying the EOS defendants' statute-of-limitations argument differ in one crucial respect that ultimately dictates a different result.
This action was initiated by Aliant in March 2012. In that initial complaint, Aliant asserted claims against Four Star Investments, Twelve Oaks Properties, WHA, and the Board members. However, no claims were asserted against the EOS defendants at that time; notably, the complaint named no fictitious defendants either. Aliant did not assert any claims against the EOS defendants until October 29, 2014. Aliant argues that it did not discover the facts surrounding the EOS defendants' role in the alleged conspiracy surrounding the Twelve Oaks development until after it began discovery in this case and, more specifically, when it deposed Harbison in August 2014; however, the EOS defendants argue that Aliant, had it been exercising reasonable diligence, should have known of the relevant facts at least when it initiated this lawsuit in March 2012-more than two years before it asserted its claims against the EOS defendants in October 2014 and, the EOS defendants argue, outside the period set forth in § 6-5-221(a), Ala. Code 1975, which provides, in relevant part:
"All civil actions in tort, contract, or otherwise against any ... engineer performing or furnishing the design, planning, specifications, testing, supervision, administration, or observation of any construction of any improvement on or to real property ... for the recovery of damages for:
"(i) Any defect or deficiency in the design, planning, specifications, testing, supervision, administration, or observation of the construction of any such improvement ...; or
"(ii) Damage to real or personal property caused by any such defect or deficiency; ...
"....
"shall be commenced within two years next after a cause of action accrues or arises, and not thereafter. ..."
Section 6-5-220(e), Ala. Code 1975, further provides that the two-year period described in § 6-5-221(a) begins to run "at the time the damage or injury is or in the exercise of reasonable diligence should *921 have been first discovered, whichever is earlier." In § 6-5-225(c), Ala. Code 1975, the legislature specifically stated that its intent in § 6-5-221(a) was to apply the discovery rule of § 6-2-3, Ala. Code 1975, to actions against architects, engineers, and builders.
As discussed in Part III, this Court explained in Bryant Bank that the question of when a reasonable person should have discovered a claim is generally a question of fact within the purview of the jury. 155 So.3d at 238. Indeed, that question will be decided only as a matter of law when the facts are undisputed and the evidence warrants but one conclusion or, stated another way, when the evidence indicates that the plaintiff actually knew of facts that would have put a reasonable person on notice of the existence of a claim. 155 So.3d at 237. The EOS defendants argue that this is precisely such a case inasmuch as, they argue, the evidence establishes that Aliant possessed information putting it on notice of the EOS defendants' alleged wrongful acts at least by October 29, 2012, two years before it actually asserted claims against them. In support of this argument, the EOS defendants emphasize that Four Star Investments defaulted on the Aliant loan in early 2011 and Aliant sued it and Smith alleging breach of his personal guaranty agreement in May 2011. In a deposition, Williamson testified that he had been monitoring the construction progress at Twelve Oaks and that, "[w]hen the note was not renewed and went into default, and then through the process of discovering additional information, I was shocked to discover that the entire proceeds of the bonds had been disbursed." Aliant thereafter obtained a judgment against Four Star Investments and Smith in August 2011. In December 2011, Aliant had the Twelve Oaks property appraised; in its March 2012 original complaint, Aliant asserts that it learned at that time that the promised improvements had not been made even though Smith and his companies were out of money with which to continue development and that the Twelve Oaks property now had a negative net value as a result of the assessments that encumbered it.
During this same time, Aliant was conducting postjudgment discovery to assist it in collecting its August 2011 judgment, and it notified EOS pursuant to Rule 45(a)(3)(A), Ala. R. Civ. P., that it intended to issue EOS a subpoena requesting the production of all documents EOS had pertaining to the District, including "[a] complete accounting of every dollar spent and/or disbursed on Twelve Oaks by the [District] or [EOS] from the funds received from the bond issue (including documents showing when, how much, for what, and to whom said disbursements were issued)." After Four Star Investments objected to the subpoena, Aliant filed a response, explaining:
"11. While Aliant's suit claims against [Four Star Investments and Smith] involved a breach of promissory note, there was much more involved. Aliant was induced by [Four Star Investments and Smith] and other parties to subordinate its first mortgage position in favor of [the District bonds]. The funds from these bonds were to be used to fund the development of the infrastructure for the Twelve Oaks subdivision.
"....
"13. It is unclear whether the funds advanced to [Four Star Investments and Smith] through the bonds were ever used in the subdivision. If there is any information in possession of any of the proposed subpoenaed parties which could be used to enhance Aliant's position or interest in the District property or lead to the discovery of additional information (including the location of *922 any depository accounts and/or any alter egos of [Four Star Investments and Smith] ) about [Four Star Investments' and Smith's] assets or the possible improper or fraudulent transfer thereof then Aliant is entitled to discover the same."
The EOS defendants allege that no subpoena was ultimately issued to them but that they voluntarily delivered the requested materials to Aliant in March 2012 and that Aliant returned them that same month after making copies for its files. Included in those materials were all the reimbursement requests and documents submitted by Smith and approved by Harbison.
In March 2012, Aliant filed its initial complaint asserting claims against the Board members, WHA, and others and alleging that a substantial amount of the bond proceeds had been improperly disbursed to Twelve Oaks Properties without proper documentation. In the course of the discovery process relating to those claims, WHA, on October 4, 2012, responded to an Aliant interrogatory regarding its oversight of the progress of the Twelve Oaks development by stating that "[t]he progress of the development would be under the purview of the district engineer, who would coordinate with the developer. [WHA] does not deal with the daily activities or progress of the construction of the improvements."[4] We also note that when U.S. Bank moved to intervene in this action in June 2012, it placed in the court record a copy of the engineer's report completed by Harbison in November 2007 and a copy of the reimbursement form that had to be completed before bond proceeds could be disbursed. This form was the same style as the completed reimbursement forms produced by the EOS defendants for Aliant in March 2012 and the form clearly indicates that no disbursement could be paid until an EOS engineer certified that the disbursement was for the Twelve Oaks project and was consistent with "(i) the applicable acquisition or construction contract; (ii) the plans and specifications for the portion of the project with respect to which such disbursement is being made; and (iii) the [November 2007] report of the consulting engineer."
We agree with the EOS defendants that this evidence establishes beyond dispute that Aliant knew of the EOS defendants' alleged wrongful acts and role in the alleged conspiracy before October 29, 2012, and that its October 29, 2014, amended complaint asserting claims against them for the first time was accordingly untimely. Even though Aliant may not have known that the proceeds of the bonds had been improperly disbursed and misused when it initiated the default action and obtained a judgment against Four Star Investments and Smith in 2011, it certainly was aware of facts indicating as much when it filed its second lawsuit in March 2012, because that initial complaint alleged that the various defendants "should have known that the requisition requests made for the bond funds were not for goods or services provided to the [Twelve Oaks development]." Aliant also had documents in its possession from at least March 2012 indicating that no bond proceeds could be disbursed unless EOS certified that the disbursal was proper and that Harbison had, in fact, approved the requests for reimbursement filed by Smith. Furthermore, it is undisputed *923 that by March 2012 Aliant had knowledge of facts that had led it to conclude that Smith's reimbursement requests had improperly been approved and paid and that Aliant was aware that EOS's approval was required before any reimbursement could be paid and that Harbison had in fact provided that approval. Nevertheless, Aliant did not assert claims against the EOS defendants until October 29, 2014. This was more than two years after those claims had accrued, i.e., when, in the exercise of reasonable diligence, they should have been discovered, and we can accordingly conclude as a matter of law that all claims asserted by Aliant against the EOS defendants are barred by the statute of limitations set forth in § 6-5-221(a). See § 6-5-221(a) (explaining that the two-year statute of limitations set forth therein applies to all civil actions "in tort, contract, or otherwise"); and Dickinson v. Land Developers Constr. Co., 882 So.2d 291, 299 (Ala. 2003) (holding that the plaintiffs discovered a number of problems with their house more than two years before they filed their action against the builder and their claims arising from those problems were accordingly barred by § 6-5-221 ).[5]
V.
Count six of Aliant's final amended complaint asserts fraud claims against Four Star Investments, Twelve Oaks Properties, and B & B Construction based on invoices submitted for reimbursement by those companies for goods and services supposedly provided to the District. Aliant asserts that many of the claimed goods were never actually provided and claimed services were never actually rendered and that those companies' receipt of bond proceeds based on those invoices accordingly constitutes fraud.
In its brief to this Court, Aliant quotes Harmon v. Motors Insurance Corp., 493 So.2d 1370, 1373 (Ala. 1986), in which this Court recited the elements of a fraud claim:
"(1) a false representation;
"(2) concerning a material fact;
"(3) reliance upon the false representation, and;
"(4) damage as a proximate result."
Aliant then proceeds to detail the evidence it submitted to the trial court indicating that the invoices submitted by Four Star Investments, Twelve Oaks Properties, and B & B Construction contain false representations *924 concerning material facts before concluding that Aliant was damaged inasmuch as the paying of the allegedly fraudulent invoices substantially exhausted the bond proceeds without providing any benefit to the Twelve Oaks development. However, although we agree that the evidence cited by Aliant constitutes substantial evidence that a false representation of a material fact was made, it is apparent, considering the whole of the evidence and Aliant's theory of the case, that Aliant never relied upon the misrepresentations in the allegedly fraudulent invoices. In Hunt Petroleum Corp. v. State, 901 So.2d 1, 4-5 (Ala. 2004), this Court explained that reliance is an essential part of any fraud claim and detailed what kind of evidence is needed to establish the element of reliance:
"The law of fraud is well-settled. 'An essential element of any fraud claim is that the plaintiff must have reasonably relied on the alleged misrepresentation.' Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1160 (Ala. 2003). Section 6-5-101, Ala. Code 1975, provides that '[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party ... constitute legal fraud.' Thus, reliance in the form that the misrepresentation is 'acted on by the opposite party' is an essential element of fraud in Alabama. Liberty Nat'l Life Ins. Co. v. Allen, 699 So.2d 138, 141 (Ala. 1997).
"....
"Reliance requires that the misrepresentation actually induced the injured party to change its course of action. See Restatement (Second) of Torts § 537 (1977) ('The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if ... he relies on the misrepresentation in acting or refraining from action, and ... his reliance is justifiable.'); 9 Stuart M. Speiser et al., The American Law of Torts § 32:49 (Clark Boardman Callaghan 1992) ('It is a fundamental principle of the law of fraud throughout the United States, regardless of the form of relief sought, that in order to secure redress, the representee (person to whom or which the misrepresentation was made) must have relied upon the statement or representation as an inducement to his action or injurious change of position.').
"This Court has explained what constitutes legal reliance in Alabama:
" ' "To determine whether or not a misrepresentation was actually relied upon, whether it was a cause in fact of the damage, the sine qua non rule is often applied. If the plaintiff would not have acted on the transaction in question but for the misrepresentation, such misrepresentation was an actual cause of his loss. If he would have adopted the same course irrespective of the misrepresentation and would have sustained the same degree of damages anyway, it can not be said that the misrepresentation caused any damage, and the defendant will not be liable therefor." '
" Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortgage Co., 390 So.2d 601, 611 (Ala. 1980) (quoting Fowler V. Harper and Fleming James, Jr., The Law of Torts § 7.13 (1956)). See also Fisher v. Comer Plantation, Inc., 772 So.2d 455, 466 (Ala. 2000) ('When deciding whether the plaintiff relied on a misrepresentation, the fact-finder must consider whether the plaintiff would have chosen a different course but for the suppression of a material fact.'). Other states have adopted similar tests.
"....
*925 "Although the terminology varies from state to state, the underlying principle is the same-for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation."
It is undisputed in this case that Aliant never relied on or changed its course of action based on the false representations allegedly made in the identified invoices. Indeed, when asked in his deposition about Aliant's involvement in the process by which the bond proceeds were disbursed, Williamson stated that "[Aliant] had no knowledge of ... any of the disbursements in how those proceeds were used." In response to a subsequent question, Williamson further stated that "[Aliant] didn't have any access to what transpired with the disbursement of the proceeds of the bond issue. We didn't know when they were disbursed, who they were disbursed to, what was supposed to happen." This testimony is consistent with Aliant's position that it did not learn that the bond proceeds had been exhausted until Four Star Investments defaulted on the Aliant loan in early 2011. In light of the undisputed fact that Aliant had no knowledge of the false representations allegedly made in the invoices submitted by Four Star Investments, Twelve Oaks Properties, and B & B Construction, it cannot have relied on those false representations. See Fisher v. Ciba Specialty Chems. Corp., Civil Action No. 03-0566-WS-B (S.D. Ala. Oct. 11, 2007) (not selected for publication in F. Supp. 2d) ("It is axiomatic that a plaintiff cannot show reliance (reasonable or otherwise) on a statement of which he or she is unaware.").
In conclusion, if the false representations allegedly made in the invoices submitted by Four Star Investments, Twelve Oaks Properties, and B & B Construction support a cause of action for fraud, that cause of action must belong to some party other than Aliant. Aliant had no knowledge of the false representations and accordingly could not have taken, or refrained from taking, any action in reliance upon those representations. Inasmuch as reliance is a required element of any fraud claim, this lack of evidence is a sufficient basis upon which to affirm the summary judgment entered by the trial court in favor of Four Star Investments, Twelve Oaks Properties, and B & B Construction on the fraud claims asserted by Aliant in count six of its amended complaint.
We also note, however, that B & B Construction has claimed that Aliant's claims against it are barred by the statute of limitations. Had Aliant asserted no other claims against B & B Construction it would be unnecessary for us to address this issue; however, inasmuch as Aliant asserts conspiracy and additional fraud claims against B & B Construction in count seven of its final amended complaint, we address B & B Construction's statute-of-limitations argument.
Aliant filed its initial complaint in March 2012; however, it did not designate any fictitious defendants in that complaint, and it did not designate B & B Construction as a defendant until it filed an amended complaint on October 29, 2014. Aliant's fraud and conspiracy claims against B & B Construction are all subject to a two-year statute of limitations. See § 6-2-3, Ala. Code 1975 ("In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."), and *926 Garris v. A & M Forest Consultants, Inc., 623 So.2d 1035, 1039 (Ala. 1993) (noting that the plaintiff's claim was "barred by the statute of limitations for a conspiracy action, which is two years; § 6-2-38(l ), Ala. Code 1975, as amended"). The question of when a reasonable person should have discovered a claim is generally a question of fact within the purview of the jury; however, that question may be decided as a matter of law when the facts are undisputed and the evidence warrants but one conclusion or, stated another way, when the evidence indicates that the plaintiff actually knew of facts that would have put a reasonable person on notice of the existence of the claim. Bryant Bank, 155 So.3d at 237-38. In this case, the relevant facts are undisputed and require the conclusion that Aliant knew or reasonably should have known of its claims against B & B Construction at least when it filed its initial complaint in March 2012. Accordingly, the claims asserted against B & B Construction for the first time in October 2014 are untimely and are barred by the statute of limitations.
In its March 2012 complaint, Aliant made the following allegations:
"47. Upon information and belief, large sums of the funds received pursuant to the bonds were diverted and not used for their intended purposes. Many were paid and/or transferred to entities wholly owned and controlled by Bobby Smith with little or no description of the actual goods or services purportedly rendered.
"....
"54. [WHA], [Twelve Oaks Properties], and the District knew or should have known that the requisition requests made for the bond funds were not for goods or services provided to the premises. Said requests were either on their face not for the premises or were so vague that a reasonably prudent person in the defendants' position would have made further inquiry and/or sought additional details."
Thus, Aliant acknowledges that it knew by March 2012 that a large amount of the bond proceeds had been paid out in reimbursements to entities "owned and controlled" by Smith. Aliant knew at that time that Smith had an ownership interest in B & B Construction, and it was in possession of the reimbursement requests indicating that bond proceeds had been claimed by B & B Construction. This information was sufficient to put Aliant on notice of its potential claims against B & B Construction, but Aliant nevertheless waited over two and a half years before filing an amended complaint asserting those claims. Because the statute of limitations for those claims was two years, however, they were untimely, and the summary judgment entered by the trial court in favor of B & B Construction is accordingly due to be affirmed in all respects.
VI.
Count seven of Aliant's final amended complaint also asserts two species of fraud claims-misrepresentation and suppression-as well as conspiracy claims against Twelve Oaks Properties, the District, Four Star Investments, Smith, Mize, and Billy Smith, and Hunt and WHA.[6] The gravamen of those claims is that the defendants conspired together and concocted a plan whereby the District was created and the bonds were issued for the purpose of enriching *927 the defendants without regard to the fact that the plan virtually ensured the ultimate failure of the Twelve Oaks development. Aliant argues that a crucial part of this plan involved the defendants' convincing Aliant to execute the mortgagee-special-assessment acknowledgment that subordinated its interest in the Twelve Oaks property-a requirement for the bonds to be issued-and, Aliant argues, the defendants accomplished that goal by making fraudulent misrepresentations and concealing and suppressing material facts. However, before we consider whether substantial evidence exists to support the fraud and conspiracy claims asserted by Aliant, we first address affirmative defenses claimed by two of the defendants named in this count.
We first note that Aliant has identified the District itself as a defendant with regard to these claims. In Part III of this opinion we addressed the Twelve Oaks defendants' § 11-99A-7 immunity argument as it related to the negligence and breach-of-fiduciary-duty claims asserted against the Board members. Although we ultimately concluded that § 11-99A-7 did not shield the Board members from liability as to those claims, under the plain language of § 11-99A-7 and § 11-47-190, we must nevertheless conclude that the District itself is entitled to immunity on the claims asserted against it by Aliant. Section 11-99A-7 expressly provides that an improvement district has "the same immunity ... as a municipality," and this Court has stated that § 11-47-190"absolves a municipality from liability for the intentional torts of its agents." Altmayer v. City of Daphne, 613 So.2d 366, 369 (Ala. 1993). The Altmayer Court specifically noted that fraud claims were among those claims barred by § 11-47-190, ibr.US_Case_Law.Schema.Case_Body:v1">id. ; conspiracy likewise is an intentional tort, and conspiracy claims are barred by § 11-47-190. See Grider v. Carver, 767 F.Supp.2d 1246, 1251 (M.D. Ala. 2011) (noting that the plaintiffs' state conspiracy claim was an intentional tort). Inasmuch as § 11-99A-7 grants the District the same immunity to which a municipality would be entitled, the summary judgment entered by the trial court is due to be affirmed with regard to the claims asserted by Aliant against the District.[7]
Aliant has also named Hunt, a partner in WHA, as a defendant to the fraud and conspiracy claims asserted in count seven of its final amended complaint; Hunt argues that the claims asserted against him personally are barred by the statute of limitations because, although WHA was named as a defendant in Aliant's initial March 2012 complaint, Aliant did not amend its complaint to add him as a defendant until October 2014-more than two years later-and thus, Hunt argues, outside the two-year period allowed by § 6-2-38. The trial court agreed with Hunt, stating in its order entering a summary judgment in his favor:
"[T]he undisputed evidence shows Aliant knew of Mr. Hunt and his role in the project in 2008, yet failed to name him in the 2012 suit. Aliant was aware that Mr. Hunt was working for Gardnyr Michael [Capital], the underwriter for the bonds, no later than July 10, 2008, the date of the validation order. ... Aliant knew of Mr. Hunt and Gardnyr Michael [Capital] at the outset of the bond deal in 2008."
This Court will decide as a matter of law when a fraud claim accrued, that is, when *928 "a person of reasonable prudence would have discovered the alleged fraud," only when the evidence is undisputed and allows but one conclusion. Bryant Bank, 155 So.3d at 237. In this case, Hunt argues only that Aliant should have been aware of its fraud and conspiracy claims against him in 2008 because it undisputedly knew at that time that he was involved in the bond issue through his work for Gardnyr Michael Capital, the underwriter for the bonds. We disagree that this is a sufficient basis upon which to conclude as a matter of law that Aliant must have known of its claims against Hunt at that time. Hunt has cited this Court to no evidence establishing when Aliant knew of Hunt's involvement in any wrongdoing; it points only to evidence establishing that Aliant knew Hunt was involved in the bond issue through his work at Gardnyr Michael Capital, the underwriter for the bonds. However, Aliant has not asserted any claims against or alleged any wrongdoing by Gardnyr Michael Capital; its claims against Hunt are based on wrongdoing he committed in his individual capacity or through his work at WHA. Hunt has not attempted to establish when Aliant should have been aware of that wrongdoing, and Aliant argues that this is an issue of fact for the jury. We cannot resolve this issue as a matter of law at this time, and we accordingly decline to affirm the summary judgment entered in favor of Hunt on that basis.
We thus turn to the merits of Aliant's fraudulent-misrepresentation claims. "To establish a prima facie case of fraudulent misrepresentation, a plaintiff must show: (1) that the representation was false, (2) that it concerned a material fact, (3) that the plaintiff relied on the false representation, and (4) that actual injury resulted from that reliance." Boswell v. Liberty Nat'l Life Ins. Co., 643 So.2d 580, 581 (Ala. 1994). As the basis for these claims, Aliant has identified alleged misrepresentations 1) orally made by Smith in his communications with Williamson and 2) contained in written materials prepared by WHA. In an affidavit, Williamson described those misrepresentations and their impact on Aliant's decision to agree to subordinate its interest in the Twelve Oaks property as follows:
"16. Over [a period of several months beginning in February 2008] Bobby Smith provided me with various documents related to the proposed bond deal, including, but not limited to, a term sheet and a financial analysis prepared by [Gardnyr Michael Capital], the engineer's report, a proposed budget analysis for the phase by phase development of the subdivision, as well as a draft of the methodology.
"17. It was not until a meeting I had with Bobby Smith in mid-July 2008 that I was presented with the mortgagee special assessment acknowledgment for [Aliant] to sign. A true and correct copy of my July 14, 2008, memo is attached hereto.
"18. I was assured by representations made by Bobby Smith and the various [District] and bond transaction documents referenced above that the bond proceeds would be used strictly for the development of the infrastructure for the remaining 270 undeveloped lots and a clubhouse and pool, that the funds' disbursement would be carefully controlled and monitored, and that there would be independent inspections to verify the expenditures purportedly made on the project.
"19. A few days later I had a follow-up discussion with Bobby Smith and Heyward Hosch, District counsel, regarding additional requirements related to the bonds and whether there were any restrictions preventing [Aliant] and Bobby *929 Smith from having agreements related to lot releases.
"20. [Aliant] was satisfied based on my discussion with Mr. Hosch and Bobby Smith that in such situation the bond fund spending could be halted or slowed. A true and correct copy of my July 21, 2008, memo is attached hereto.
"21. At no time was it revealed to me that the parties intended to use any of the bond proceeds to pay any Bobby Smith-controlled entity (owner, developer, or otherwise) for work done or expense incurred before the bond issue.
"22. Based on all of the above, Aliant executed the mortgagee special assessment acknowledgment on or about July 24, 2008.
"23. If I had known that all of the equity built up in the development was going to be given back to the development with the first two draws, that there were not going to be controls over the disbursements of the bond funds, and that the progress of the development was not going to be carefully monitored by professionals, I would not have signed the mortgagee special assessment acknowledgment.
"24. As of July 24, 2008, the infrastructure of phase I of the development was complete and eighty (80) lots of that phase [were] available for development.
"25. I was told that the bond proceeds would be used to expand the subdivision so that an additional 270 lots (a total of 350) would be made available.
"26. I had [no] idea that over one half of the total bond proceeds was going to be used to reimburse Bobby Smith and [Twelve Oaks Properties] for virtually all of the pre-bond issuance work, work which had been funded with money largely advanced by Aliant through [the Aliant loan].
"27. As of [January 27, 2016], with the exception of the club house and pool, the infrastructure is not measurably further along and there are no more completed and saleable lots available than existed on the day I signed the [mortgagee special assessment] acknowledgment."
In paragraph 18 of his affidavit, Williamson identified three representations allegedly made to him that Aliant now claims were false: (1) that the bond proceeds would be used only to develop the infrastructure for the remaining 270 undeveloped lots and a clubhouse and a pool; (2) that the disbursement of the bond proceeds would be carefully controlled and monitored; and (3) that there would be independent inspections to verify the expenditures claimed by Smith. This is sufficient to establish a prima facie case of fraudulent misrepresentation against Smith and Twelve Oaks Properties, the entity Smith is alleged to have been representing when making the oral misrepresentations. Accordingly, the summary judgment was improper as to those claims.
However, Aliant has failed to support its claim that Hunt and WHA made those representations. In fact, a review of the documents identified in paragraph 16 of Williamson's affidavit that were prepared by Hunt and WHA reveals that they do not contain those representations. The party asserting a fraudulent-misrepresentation claim must support that claim with specific evidence of the alleged misrepresentations. See, e.g., Drummond Co. v. Walter Indus., 962 So. 2d 753, 787- 88 (Ala. 2006) (affirming a summary judgment entered on a fraud claim on the basis that the claimant "failed to identify the specific representations on which it based its fraud claim, to whom and by whom those communications were purportedly made, when they were purportedly made, and in what manner [the claimant] relied on the purported communications''). In the absence of *930 any specific evidence indicating that Hunt or WHA made false representations upon which Aliant relied, the summary judgments entered by the trial court in favor of Hunt and WHA are due to be affirmed with respect to the fraudulent-misrepresentation claims asserted by Aliant.
Aliant also argues that the misrepresentations allegedly made by Smith and in the WHA documents should support fraudulent-misrepresentation claims against Hunt, WHA, Four Star Investments, Mize, and Billy Smith because, it argues, they were all allegedly part of an overarching conspiracy. However, this argument evinces a misunderstanding of the conspiracy cause of action. If the finder of fact is ultimately convinced that Smith made fraudulent misrepresentations and that there was a conspiracy in which Hunt, WHA, Four Star Investments, Mize, and Billy Smith were participants, then Hunt, WHA, Four Star Investments, Mize, and Billy Smith may be held liable for Smith's fraudulent misrepresentations by being held liable for conspiracy, not fraudulent misrepresentation. This Court's decision in DGB is instructive. We noted in that case that the fraudulent-misrepresentation and fraudulent-suppression claims asserted against defendant Ray Jacobsen were properly dismissed, but a conspiracy claim asserted against Jacobsen based on allegations that other defendants worked together and with him "to knowingly misrepresent information and to conceal material facts" was nevertheless viable. DGB, 55 So.3d at 231-34.
We next consider the fraudulent-suppression claims asserted by Aliant. The gravamen of those claims is that the defendants knew that Smith was going to use the bulk of the bond proceeds to reimburse himself and his companies for work done before the bonds were issued and that the defendants concealed this fact from Aliant in order to induce it to sign the mortgagee-special-assessment acknowledgment. "The elements of a suppression claim are '(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury.' " Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C., 932 So.2d 883, 891 (Ala. 2005) (quoting Lambert v. Mail Handlers Benefit Plan, 682 So.2d 61, 63 (Ala. 1996) ). Aliant does not cite these elements anywhere in the briefs it filed in its appeals of the judgments entered in favor of the Twelve Oaks defendants and Hunt and WHA, but it cites Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortgage Co., 390 So.2d 601, 616 (Ala. 1980), for the proposition that fraudulent suppression exists "where the defendant has special knowledge or means of knowledge not open to the plaintiff and is aware that the plaintiff is acting under a misapprehension as to facts which would be of importance to him and would probably affect his decision" and Bank of Red Bay v. King, 482 So.2d 274, 284-85 (Ala. 1985), to suggest that fraudulent suppression might be found when a party knows that the plaintiff is relying on something that is not true. See Aliant's briefs in appeal no. 1150822, pp. 31-33, and in appeal no. 1150823, pp. 29-31.
The first element of a fraudulent-suppression claim that must be established is whether the defendant alleged to have concealed a material fact had a duty to disclose that fact to the plaintiff; this inquiry presents an issue of law to be determined by the court. Freightliner, 932 So.2d at 891. To the extent Aliant addresses this element, it essentially argues that the various defendants owed it such a duty based solely on the fact that they knew that Aliant was unaware that the vast majority *931 of the bond proceeds would be disbursed to reimburse Smith and his companies for work completed before the bonds were issued. See, e.g., Aliant's brief in appeal no. 1150823, p. 33 (arguing that the trial court erred in entering a summary judgment in favor of Hunt and WHA on the fraudulent-suppression claims asserted against them because the trial court failed to give effect to the law set forth in Shades Ridge Holding Co. and Bank of Red Bay, which, Aliant argues, "creat[ed] a duty for WHA to disclose the detail of the plan for the [District] by reason of their knowledge of Aliant's misapprehension"). We disagree that the defendants' knowledge that Aliant was unaware that the bond proceeds could be distributed for work performed before the bonds were issued was sufficient in itself to create a duty to disclose.
This Court has explained the duty to disclose as follows:
"A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent. Dodd v. Nelda Stephenson Chevrolet, Inc., 626 So.2d 1288 (Ala. 1993) ; Hardy v. Blue Cross & Blue Shield of Alabama, 585 So.2d 29 (Ala.1991) ; King v. National Foundation Life Ins. Co., 541 So.2d 502 (Ala. 1989) ; see, McGowan v. Chrysler Corp., 631 So.2d 842 (Ala. 1993) ; § 6-5-102, Ala. Code 1975.
"....
"This Court has stated that whether one has a duty to speak depends upon a fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case. Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch Inc., 611 So.2d 238 (Ala. 1992) ; Norman v. Amoco Oil Co., 558 So.2d 903 (Ala. 1990) ; see § 6-5-102, Ala. Code 1975. When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested."
Mason v. Chrysler Corp., 653 So.2d 951, 954-55 (Ala. 1995) (emphasis added). Essentially, the primary factor to be considered when determining whether a duty to disclose exists is the nature of the relationship between the parties. See, e.g., Armstrong Bus. Servs., 817 So.2d at 677 (noting that the Court begins its inquiry by considering whether the facts establish "a relationship sufficient to give rise to a duty to disclose"). A duty to disclose is more likely to be found where there is a special or confidential relationship between the parties, but a duty to disclose may still be found when the parties engage in an arm's length business transaction and there are special circumstances or when specific information is requested. Mason, 653 So.2d at 954-55. However, it will be the rare situation and only under the most extreme special circumstances that a duty to disclose is imposed upon parties that have no relationship with each other.
In this case, it is undisputed that Aliant had no relationship with Hunt and WHA. At most, the evidence in the record indicates that Hunt was a participant in one telephone call with an Aliant employee and the substance of that call is unknown. Based on this lack of a relationship-much less a confidential relationship or even an arm's length business relationship-we cannot conclude that Hunt and/or WHA owed Aliant a duty to disclose. Aliant has identified no special circumstances that warrant the imposition of such a duty; instead, it effectively assumes that such a duty existed solely because Hunt and *932 WHA had greater knowledge than it and said nothing. However, "mere silence in the absence of a duty to disclose is not fraudulent." Mason, 653 So.2d at 954. The summary judgment entered in favor of Hunt and WHA on the fraudulent-suppression claims asserted against them is due to be affirmed.
With regard to the claims asserted against the various Twelve Oaks defendants, however, Aliant did have a business relationship with Smith. Aliant has alleged that Smith represented to it that the bond proceeds would be used to develop 270 additional lots in Twelve Oaks while allegedly knowing that he and/or his companies would actually receive the majority of the bond proceeds for work that had already been performed in association with the development of the first 80 lots. In CNH America, LLC v. Ligon Capital, LLC, 160 So.3d 1195, 1202-03 (Ala. 2013), we explained that " 'once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated' " (quoting Freightliner, 932 So.2d at 895 ). See also First Alabama Bank of Montgomery, N.A. v. First State Ins. Co., 899 F.2d 1045, 1056 (11th Cir. 1990) ("Finally, even if one is not under a duty to speak, if he decides to do so, 'he must make a full and fair disclosure,' without concealing any facts within his knowledge." (quoting Ellis v. Zuck, 409 F.Supp. 1151, 1158 (N.D. Ala. 1976), and citing Jackson Co. v. Faulkner, 55 Ala.App. 354, 315 So.2d 591 (1975) )). Thus, once Smith represented how the bond proceeds would be used, he had a duty to make a full disclosure as to how those proceeds would be used. Aliant has submitted evidence indicating that Smith failed to fulfill that duty and instead concealed the truth about how the bond proceeds would be used, thus inducing Aliant to execute the mortgagee-special-assessment acknowledgment and resulting in subsequent injury to Aliant. Accordingly, the summary judgment entered on the fraudulent-suppression claims asserted against Smith and Twelve Oaks Properties is due to be reversed. Aliant has failed to establish that Mize or Billy Smith owed it a duty to disclose, however, and the summary judgments entered in favor of them on the fraudulent-suppression claims asserted by Aliant are due to be affirmed.
Finally, inasmuch as we have held that Aliant has put forth substantial evidence supporting at least some of the fraudulent-misrepresentation and fraudulent-suppression claims asserted in count seven of its final amended complaint and that the trial court accordingly erred in entering a summary judgment against Aliant on those claims, we also hold that the trial court erred in entering a summary judgment against Aliant on the conspiracy claims it asserted against Smith, Twelve Oaks Properties, Four Star Investments, Mize, Billy Smith, Hunt, and WHA. Some of the defendants have argued that they cannot be found liable for conspiracy if they are not liable for the underlying wrong upon which the conspiracy claim is based; however, our holding in DGB refutes this argument. Although it is true that "[a] plaintiff alleging conspiracy must have a valid underlying cause of action," Callens v. Jefferson County Nursing Home, 769 So.2d 273, 280 (Ala. 2000), it is not necessary that each alleged conspirator be the subject of an underlying cause of action, only that there be a valid cause of action against at least one of the alleged conspirators. See DGB, 55 So.3d at 234 ("Because the [plaintiffs] have alleged valid underlying causes of action and because acts of coconspirators are attributable to each other, see [ Ex parte] Reindel, [963 So.2d 614, 621 (Ala. 2007),] the [plaintiffs] have stated a claim of civil conspiracy upon *933 which relief may be granted against each of these defendants."). Thus, the defendants in this case may be liable for conspiracy even if they are not liable for the underlying fraud.
VII.
In count eight of its final amended complaint, Aliant asserts wantonness claims against Smith, Mize, Billy Smith, Twelve Oaks Properties, and WHA.[8] Specifically, Aliant asserts that these defendants "undertook a duty to carefully and prudently spend and/or assure that the [bond proceeds] were spent in accordance with the bond documents to make the promised improvements" and that they "consciously and/or intentionally acted with reckless disregard to the consequences of their wrongful acts."
We first note, however, that, although Aliant adequately explained the basis of its wantonness claim in its complaint, in its brief to this Court in appeal no. 1150822 challenging the judgment entered in favor of the Twelve Oaks defendants, Aliant has wholly failed to explain its wantonness claim or to cite any authority regarding wantonness. In J.K. v. UMS-Wright Corp., 7 So.3d 300, 305-06 (Ala. 2008), we considered an argument that a trial court had erred in entering judgment on a wantonness claim where the appellants had similarly failed to support their argument:
"Not only do [the appellants] not describe with any specificity conduct of the trustees that they consider to have been wanton, but they also fail to cite any statute or caselaw that defines wantonness, and they do not illustrate how the actions by the members of the board of trustees could satisfy any such definition. ' " 'Where an appellant fails to cite any authority, we may affirm, for it is neither our duty nor function to perform all the legal research for an appellant.' " ' McCutchen Co. v. Media General, Inc., 988 So.2d 998, 1004 (Ala. 2008) (quoting Henderson v. Alabama A & M Univ., 483 So.2d 392, 392 (Ala. 1986), quoting in turn Gibson v. Nix, 460 So.2d 1346, 1347 (Ala. Civ. App. 1984) ). Because [the appellants] have not provided us with a standard against which to evaluate the trustees' allegedly wanton behavior ... the trial court's judgment on this issue is affirmed."
Thus, by failing to adequately argue the issue, Aliant has effectively waived its argument that the trial court erred in entering summary judgment against it on the wantonness claims asserted against Smith, Mize, Billy Smith, and Twelve Oaks Properties. Bogle, 512 So.2d at 1337.
With regard to the wantonness claim asserted against WHA, we stated in Lemley v. Wilson, 178 So.3d 834, 841-42 (Ala. 2015), that, " '[t]o establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty.' " (Quoting Martin v. Arnold, 643 So.2d 564, 567 (Ala. 1994).) Aliant has based its wantonness claims on the omission or breach of a known duty; however, we have already determined, supra in Part III, that WHA owed Aliant no duties. Moreover, Aliant's wantonness claims are premised on the allegation that the named defendants failed to make sure that the bond proceeds were properly spent; however, the documentary evidence in the record establishes that WHA had no role in *934 approving the disbursement of bond proceeds. Disbursements had to be approved by EOS and the District's board of directors; WHA provided only administrative assistance in that process. Accordingly, the summary judgment entered in favor of WHA on the wantonness claim asserted against it in count eight of Aliant's final amended complaint is also due to be affirmed.
VIII.
In the last count of its final amended complaint, Aliant argues that Twelve Oaks Properties and WHA are liable for breach of contract. Aliant acknowledges that there is no contract between it and either Twelve Oaks Properties or WHA; however, it nevertheless argues that it was an intended third-party beneficiary of 1) a completion agreement between Twelve Oaks Properties and the District executed in conjunction with the bond issuance in which Twelve Oaks Properties took responsibility for completing the planned improvements at Twelve Oaks that were not funded by the bond proceeds; and 2) the management agreement between WHA and the District. In Swann v. Hunter, 630 So.2d 374, 376 (Ala. 1993), this Court stated:
"To recover in a breach-of-contract action, as a third-party beneficiary, the plaintiff must prove the following: (1) that the contracting parties intended, when they entered the contract, to bestow a direct, as opposed to an incidental, benefit upon a third party, (2) that the plaintiff was the intended third-party beneficiary of the contract, and (3) that the contract was breached. ..."
Aliant argues that the completion agreement executed by Twelve Oaks Properties and the management contract executed by WHA were intended to benefit the owners of property in the District-including Aliant inasmuch as it held a mortgage on the Twelve Oaks property-and that Twelve Oaks Properties and WHA failed to fulfill their obligations under those contracts to the detriment of Aliant.
Both the completion agreement and the management agreement were intended to bestow some benefit upon the District. Aliant argues, essentially, that, inasmuch as the District's raison d'etre is to provide improvements to the property within its borders, as the holder of an interest in such property it was an intended beneficiary of any contract that benefited the District. Twelve Oaks Properties and WHA rightfully do not dispute that Aliant had an interest in property within the District when those contracts were executed because it is undisputed that Aliant held a mortgage on the Twelve Oaks property at that time and "Alabama is a 'title theory' state; thus, when a person mortgages real property, the mortgagee obtains legal title to the real property and the mortgagor retains an equity of redemption." Maiden, 69 So.3d at 865. However, Twelve Oaks Properties and WHA argue that Aliant's interest in the Twelve Oaks property at most made Aliant an incidental beneficiary to the cited contracts, not a direct beneficiary such that Aliant can sue for the breach of a contract. See Holley v. St. Paul Fire & Marine Ins. Co., 396 So.2d 75, 80 (Ala. 1981) ("One who seeks recovery in contract as a third-party beneficiary must establish that the contract was intended for his direct, as opposed to incidental, benefit."). In its orders entering a summary judgment against Aliant on these claims, the trial court agreed, holding that Aliant was not an intended third-party beneficiary to either of the cited contracts.
"[T]he determination of third-party-beneficiary status is a conclusion of law that we review de novo."
*935 Harris Moran Seed Co. v. Phillips, 949 So.2d 916, 920 (Ala. Civ. App. 2006). For the reasons that follow, we agree with the holding of the trial court that Aliant was not an intended beneficiary to the cited contracts. Although those contracts were intended to benefit the District, even if we were to conclude that the parties to those contracts intended to bestow benefits upon the "owners" of property within the District as well, those benefits would run directly only to the party in possession of the property-any benefit to the mortgagee would necessarily be incidental.[9] Benefits and improvements made to mortgaged property would not directly benefit the mortgagee until there is a merger of equitable title and legal title. At best, Aliant in this case would receive an incidental benefit from the cited contracts inasmuch as the property securing the Aliant loan would increase in value and Aliant's risk of loss in the event of default would decrease; however, this is far from a direct intended benefit that will support a third-party-beneficiary breach-of-contract claim. Accordingly, the trial court's judgments in favor of Twelve Oaks Property and WHA on the claims asserted against them in count nine of Aliant's amended complaint are due to be affirmed.
IX.
Aliant sued various individuals and business entities involved in developing the Twelve Oaks subdivision in Odenville, alleging that, as a result of those defendants' conspiracy and wrongful actions, Aliant's security interest in the property upon which the Twelve Oaks subdivision was to be built had been rendered worthless. The trial court ultimately entered judgments against Aliant and in favor of the defendants on all counts. We now affirm those judgments in part and reverse them in part. In appeal no. 1150822, we reverse the summary judgment entered by the trial court against Aliant (1) on the negligence and breach-of-fiduciary-duty claims asserted against the Board members in count four of Aliant's complaint; (2) on the fraudulent-misrepresentation and fraudulent-suppression claims asserted against Smith and Twelve Oaks Properties in count seven of Aliant's complaint; and (3) on the conspiracy claims asserted against Smith, Twelve Oaks Properties, Four Star Investments, Mize, and Billy Smith in count seven of Aliant's complaint. We affirm the summary judgment entered by the trial court against Aliant and in favor of the various Twelve Oaks defendants in all other respects. In appeal no. 1150823, we reverse the summary judgments entered against Aliant on the conspiracy claims asserted against Hunt and WHA in count seven of Aliant's complaint; however, we affirm those summary judgments with regard to all other claims asserted by Aliant against Hunt and WHA. Finally, in appeal no. 1150824, we affirm the summary judgment entered by the trial court *936 against Aliant and in favor of the EOS defendants on all counts.
1150822-AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1150823-AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1150824-AFFIRMED.
Bolin, Parker, Main, and Wise, JJ., concur.
Shaw, J., concurs in the result.

Some individuals who had purchased lots in Twelve Oaks were also added as parties to the lawsuit at various times; however, the claims involving those parties are not relevant to these appeals.

It appears that counts one, two, and three of Aliant's final amended complaint were primarily directed to Allstate and determining the validity of the assessments securing the bonds issued by the District and Aliant's interest in the Twelve Oaks property in relation to any interest that Allstate might have. As explained supra, Aliant has settled its claims with Allstate, but, to the extent counts one, two, and three might assert claims against other defendants that are parties to these consolidated appeals, Aliant has waived those claims by failing to argue that the trial court erred in its disposition of them.

At some point, Aliant produced a copy of WHA's interrogatory responses for the EOS defendants. Notes, presumably made by the person who reviewed the responses on behalf of Aliant, were handwritten next to the responses, and the note next to WHA's response explaining that the progress of the development was "the purview of the district engineer" reads "Add Engineer?"

Aliant has argued that it did not discover the facts that form the basis of its claims against the EOS defendants until it deposed Harbison in August 2014 and when, in conjunction with that deposition, the EOS defendants produced an internal memorandum written by Harbison in June 2012 indicating that, in May 2012, Harbison had discovered that Smith had copied his signature to certain reimbursement forms that had been submitted and paid. Aliant argues that the EOS defendants suppressed this memorandum; the EOS defendants dispute that characterization, arguing that it did not exist when they voluntarily produced their Twelve Oaks records for Aliant in March 2012 and that they had received no further communications or request for information from Aliant until Aliant sought Harbison's deposition in the summer of 2014, at which time the memorandum was produced. We note only that, although this memorandum and Harbison's deposition may have revealed additional facts pertinent to Aliant's case, it is still undisputed that Aliant had knowledge of the facts that form the basis of its claims against the EOS defendants for more than two years before it formally asserted those claims. Aliant's claim accrued when it became privy to facts that would provoke inquiry in a person of reasonable prudence and that, if further investigated, would have led to the discovery of the EOS defendants' alleged deficient performance of their duties, not when Aliant became privy to all the facts surrounding the EOS defendants' alleged wrongdoing. Dickinson, 882 So.2d at 299.

Count seven also asserts those claims against the EOS defendants and B & B Construction; however, for reasons already discussed, those claims are barred by the relevant statutes of limitations, and we accordingly need not address the specific allegations made against the EOS defendants and B & B Construction in the context of those claims.

Aliant has also asserted a wantonness claim against the District in count eight of its amended complaint; that claim is also barred by § 11-99A-7. See Town of Loxley v. Coleman, 720 So.2d 907, 909 (Ala. 1998) ("This Court has construed § 11-47-190 to exclude liability for wanton misconduct.").

Aliant also asserts wantonness claims against the EOS defendants and the District in count eight; however, as discussed supra, all claims against the EOS defendants are barred by the statute of limitations, and the District is protected by § 11-99A-7 immunity.

In First Union National Bank of Florida v. Lee County Commission, 75 So.3d 105, 113 (Ala. 2011), this Court explained how a mortgagee and a mortgagor are both in some sense "owners" of mortgaged property:
"[The mortgagee's] argument presumes that legal title is the equivalent of absolute ownership of property, but that presumption is incorrect. See Alabama Home Mortgage Co. v. Harris, 582 So.2d 1080, 1083-84 (Ala. 1991) (recognizing that there is no 'absolute owner' of property until there is a merger of equitable title and legal title). [The mortgagee's] interpretation of the term 'owner' in § 40-10-28[, Ala. Code 1975,] fails to consider the fact that when real property is mortgaged, only legal title passes to the mortgagee, and the mortgagor retains his or her other status as 'owner and holder of equitable title.' Sims v. Riggins, 201 Ala. 99, 103, 77 So. 393, 397 (1917) (the mortgagor is 'the owner and holder of the equitable title'). Until there has been a foreclosure, the mortgagor continues to 'own' the property. Alabama Home Mortgage, 582 So.2d at 1083-84."